## STATE ex rel. ATTORNEY GENERAL v. MARTIN.

No. 18080. Opinion Filed May 21, 1927.

(Syllabus.)

1. Judges—Constitutional and Statutory Provisions—Disqualification of Supreme Court Justices for Prejudice.

The Constitution of Oklahoma, article 2, section 6, provides:

"Right and justice shall be administered without sale, denial, delay, or prejudice."

And section 2629, Oklahoma Compiled Statutes, provides:

"No judge of any court of record shall sit in any cause or proceeding in which he may be interested, or in the result of which he may be interested * * * or in which is called in question the validity of any judgment or proceeding in which he was of counsel or interested, * * * provided that the disqualifications herein imposed shall not exclude the disqualifications at common law."

And section 2632, Oklahoma Compiled Statutes, provides:

STATE EX REL. v. MARTIN

"* * * The same disqualification shall apply to the members of the Supreme Court and the Criminal Court of Appeals as to other courts of record."

Under the Constitution and laws of this state, this court has the power and authority, when the question is properly presented, to disqualify any one or more of its members from participating in the trial or hearing of any cause pending in the court. When it is made to appear to the satisfaction of the court that certain Justices are in any way, from any cause, biased or prejudiced against one of the parties litigant to such an extent that said party might not have a fair, unbiased, and impartial hearing in said cause before said Justices, it is the duty of the court to declare such disqualifications.

**2. Same—Right to Question Disqualification.**

It does not always rest with the judge alone whose right to sit is questioned to say whether he is or is not disqualified. In cases where there is a doubt or question, it should be referred to the decision of the court.

**3. Same—Contempt as "Cause or Proceeding" Pending Before Court.**

Contempt is a "cause or proceeding" sufficiently within the meaning of the language of the provisions of the Oklahoma statutes as to be classified as a matter pending before the court.

**4. Same—Supreme Court Justices Held Disqualified in Contempt Proceeding.**

From the record in this case, and the undisputed facts appearing herein, the disqualifications of the judges are shown. (For facts see opinion.)

Contempt proceeding in Supreme Court against H. B. Martin by the State on the relation of the Attorney General. Mandamus by respondent against Justices J. W. Clark and Fletcher Riley, directing them to certify their disqualifications. Prayer granted.

(Seven of the nine Justices of the Supreme Court having voluntarily certified their disqualifications in the contempt proceeding, the following were duly appointed and qualified as Special Justices: W. E. Utterback, H. D. Henry, Dan Huett, A. Scott Thompson, Kelly Brown, A. R. Swank, and W. N. Lewis.)

A petition for a writ of mandamus was filed in this court by counsel for respondent, H. B. Martin, which petition is as follows:

"Now comes H. B. Martin, petitioner and movant herein, and alleges and states he is a resident and citizen of Tulsa, Tulsa county, state of Oklahoma. That the respondent Fletcher Riley, is a Justice of the Supreme Court of Oklahoma, and is a resident of Comanche county, Oklahoma, and that the respondent, J. W. Clark, is a Justice of the Supreme Court of Oklahoma, and is a resident of Atoka county, Oklahoma. That the said Fletcher Riley was duly elected as Justice of the Supreme Court of the state of Oklahoma, and is, at this time, and at all times hereinafter mentioned, has been, a Justice of the Supreme Court of the state of Oklahoma, and that the respondent J. W. Clark was duly elected as Justice of the Supreme Court of the state of Oklahoma, and is at this time and has been at all times hereinafter mentioned a Justice of said court.

"For his cause of action herein, petitioner and movant alleges and states:

I.

"That on the 8th day of January, 1927, there was filed in this court an information on the relation of the Attorney General of the state of Oklahoma, as relator, versus H. B. Martin, respondent, numbered upon the docket of this court 18080, and upon said information a citation for contempt of court was duly issued and served upon this petitioner and movant. That said information and said citation are and remain on file in the office of the clerk of this court, and are made a part of this motion by reference, the same as if herein in full set out.

II.

"Movant further alleges and says that in said cause No. 18080 the said H. B. Martin, respondent therein, and movant herein, filed on the 13th day of January, 1927, his verified motion and request, requesting certain of the Justices of this honorable court, including the Justices above named, as respondents herein, to certify upon the journal of this court their disqualification, respectively, to sit as Justices upon the trial of said cause. That said motion and request was in writing, and is and remains in the office of the clerk of this honorable court, and that the same is hereby made a part of this motion by reference, the same as if herein in full set out.

III.

"Your movant further alleges and states that on the presentation of the said motion requesting certain Justices of the Supreme Court to certify their disqualification in said cause No. 18080, all the justices of the Supreme Court of the state of Oklahoma certified their disqualification in said cause, except the respondents above named, and that said respondents made an order, refusing to certify their disqualification in said cause, and stating certain reasons for such refusal, which said order is and remains on file and of record in cause No. 18080 in this court, in writing, and which said order is made a part of this motion by reference, the same as if herein in full set out.

IV.

"Petitioner and movant says and avers

that the respondent Justice Fletcher Riley is disqualified by bias and prejudice against this movant to act and sit as a Justice of this court in the trial of said cause. That said disqualification arises upon the following facts:

"That in a certain cause heretofore pending in this court numbered upon the dockets of this court No. 13646, a certain written opinion was prepared and filed by the respondent Justice J. W. Clark, and published as the opinion of this honorable court in said cause. That said opinion as written and filed bore the names of four Justices, purporting to concur therein, including the name of Justice C. W. Mason of said court. That in a certain other cause, heretofore pending in this court, numbered upon the dockets of this court No. 17409, a certain motion in writing was filed on the 3rd day of January, 1927, with the clerk of said court, in which motion, among other things it was pleaded that the said opinion was not concurred in by the said Justice C. W. Mason in fact, but that the representation made upon said written opinion was, in that respect, untrue, and movant says that this movant prepared, as counsel for one O. O. Owens and others, parties to said suit, the aforesaid motion last above described, and filed the same in the office of the clerk of this honorable court. That the filing of said motion is made the basis of the information filed as aforesaid in said cause No. 18080. and movant further shows to the court that there is now pending, and has been pending for some months, a certain action in the district court of Oklahoma county, Oklahoma, in which the said respondent Justice Fletcher Riley is plaintiff, and sues the said O. O. Owens for the sum of $200,000 damages because of an alleged libel. That this movant is counsel in said cause for the said O. O. Owens, and that this suit arises out of the conduct of the said respondents Justice Fletcher Riley and Justice J. W. Clark, in the decision or purported decision of the aforesaid cause in this court, No. 13646, and that all of the causes hereinbefore mentioned are related to each other and arose out of the same transactions, and movant says that there is now pending in the district court of Tulsa county, Oklahoma, a certain action, wherein the aforesaid O. O. Owens is plaintiff, and in which said action this movant is counsel for the said O. O. Owens, and in which said action both of the respondents above named, among others, are defendants, and movant says that said action involves a claim asserted against the above-named respondent and others, for damages in the amount of $100,000, and other relief upon the ground of fraud alleged to have been practiced by the defendants in said cause. And movant says that both of the respondents are, because of said facts hereinbefore set out, not only biased and prejudiced against this movant so that they ought not to sit as judges in this cause, but, in addition thereto, that both of said respondents are interested, though not parties, to this action, and its result, and cannot, on said account, lawfully sit in the determination of this cause. And movant further says that he has been advised that the respondents and each of them are further disqualified to sit as Justices in the trial of said cause because, in said cause, on the said 13th day of January, 1927, before any trial of said cause was had or commenced, and without any hearing whatever, either upon the facts or the law, that the respondents and each of them rendered an opinion and decision in said cause, in which in substance, it was held that if the information filed in said cause charges any contempt, the same is a direct contempt, and movant says that whether or not the matters charged in said information in said cause No. 18080 constitute a charge of a direct contempt of court or an indirect contempt, or any contempt, are issues of law, necessary to be determined in said cause, and that the aforesaid opinion and holding announced by the said respondent is, to that extent, a prejudgment of said cause, and said issues, and movant says that he is advised and therefore pleads that such action on the part of the said respondents as Justices of this honorable court constitutes a charge of a direct contempt of court or deprivation as to this movant of his liberty and property, in contravention of the guaranties of the Constitution and laws of the United States of America, and particularly the Fifth and Fourteenth articles of Amendment to the Constitution of the United States of America. And movant says that he is advised and therefore pleads that such conduct on the part of said respondents as Justices of this honorable court, hereinbefore set out, constitutes a denial of due process of law to this movant, guaranteed by the Constitution and laws of the state of Oklahoma.

### V.

"Movant further alleges and states that on the 29th day of January, 1927, there was served upon the respondents herein, Fletcher Riley, Justice of the Supreme Court of the state of Oklahoma, and J. W. Clark, Justice of the Supreme Court of the state of Oklahoma, a written notice that this movant would apply to the Supreme Court of the state of Oklahoma for a writ of mandamus, commanding them, the said Fletcher Riley and J. W. Clark, to certify their disqualification as is by the statutes provided, and that the petition and motion of this movant would be presented to the Supreme Court of the state of Oklahoma on the 2nd day of February, 1927, at ten o'clock in the forenoon, or as soon thereafter as the same could be heard by the court.

### VI.

"Movant further alleges and states that

he has no adequate remedy at law other than the writ herein prayed for.

"Wherefore, movant and petitioner prays for an order and judgment of this court, awarding to him a peremptory writ of mandamus, and directing and commanding the said respondents and each of them, as Justices of the Supreme Court of the state of Oklahoma, to certify their disqualification as Justices of the Supreme Court of the state of Oklahoma in cause No. 18080, and for all other and further proper relief.

"A. F. Moss and H. A. Ledbetter,
"Attorneys for Petitioner and Movant.

"State of Oklahoma, Oklahoma County, ss.

"H. B. Martin, being duly sworn, says that he is the movant and petitioner in the above entitled cause; that he has read the foregoing motion and that the statements, averments, and allegations therein made and contained are true.

"H. B. Martin.

"Subscribed and sworn to this 1st day of of February, 1927.

"A. E. Carter, Notary Public.
"My commission expires June 3, 1928.
"(Seal)

"Amendment to Petition for Writ of Mandamus.

"Note: This is the amendment to the application for mandamus filed before the special court, and considered on the 3rd of February.

"Your movant further states that on February 2, 1927, there was filed in said case No. 18080, a motion requesting that the disqualification of the aforementioned Justices be entered; that on hearing and determination thereof said Justices failed and refused to certify their disqualification, and the court declined and refused to cause to be entered of record their disqualification, and said disqualified Justices are attempting to, and will, unless prevented by writ of mandamus, proceed therein, and this cause is filed as ancillary to No. 18080, pursuant to leave granted in said cause on February 3, 1927."

To this petition Justices Clark and Riley, by counsel appearing as amici curiae, answer as follows:

The following statement was dictated into the record by Mr. Cochran, as a rep'y to the application for writ of mandamus filed in cause No. 18080, on February 3, 1927.

"Mr Cochran: I can dictate my statement in a few minutes.

"In reply to the motion which is filed we allege that on February 1, 1927, an application for a writ of mandamus was filed in the Supreme Court of the state of Oklahoma, in a case entitled H. B. Martin versus Fletcher Riley, Justice of the Supreme Court, and J. W. Clark, Justice of the Supreme Court, Respondents, same being cause No. 18123, that the application filed in that case is identical with the motion which is now filed in this proceeding. That said motion, or said application was heard by the Supreme Court of the state of Oklahoma on February 2, 1927, and a final order and judgment of that court was entered, denying the application for a writ of mandamus; that said order and judgment is now conclusive on the question which is now presented to this court, and is res adjudicata. That is all."

Respondent's answer to the citation issued herein alleges his belief of the truth of the charges made in the motion, which contains the alleged scurrilous and defamatory matter affecting certain Justices of the Supreme Court.

H. A. Ledbetter, A. F. Moss, and Christy Russell, for petitioner, H. B. Martin.

Thomas H. Owen, C. B. Cochran, and D. H. Linebaugh, amici curiae, for respondents.

UTTERBACK, Special Chief Justice (after stating the facts as above).

First: Can the Supreme Court in an action for contempt declare members of the Supreme Court disqualified by reason of interest, bias or prejudice? It is contended by counsel for the court that the Supreme Court and the members thereof have no legal authority to disqualify a member of the Supreme Court in a proceeding of this character, and we will, therefore, dispose of this question first. Section 6, art. 2, of the Oklahoma Constitution provides:

"Right and justice shall be administered without sale, denial, delay or prejudice."

Section 2629, Compiled Oklahoma Statutes, is as follows:

"No judge of any court of record shall sit in any cause or proceeding in which he may be interested, or in the result of which he may be interested, or when he is related to any party to said cause within the fourth degree of consanguinity or affinity, or in which he has been of counsel for either side or in which is called in question the validity of any judgment or proceeding in which he was of counsel or interested, or the validity of any instrument or paper prepared or signed by him as counsel or attorney, without the consent of the parties to said action entered of record: Provided, that the disqualifications herein imposed shall not exclude the disqualifications at common law."

And section 2632, Compiled Oklahoma Statutes, is as follows:

"No Justice of the Supreme Court of this state or Judge of the Criminal Court of Appeals shall participate in the decision of any cause in such court appealed thereto from a lower court of said state, in which court such Justice or Judge was judge presiding at the trial of such cause; and the same qualifications shall apply to the members of the Supreme Court and the Criminal Court of Appeals, as to other courts of record; and, whenever any member of either of said courts is disqualified, the same shall be entered of record in such court, and such disqualifications of such member shall forthwith be certified by the clerk of such court to the Governor of the state, who shall appoint some members of the bar of the state, possessing the same qualifications as the members of such court, to sit as special judge in said cause."

It is apparent from the two sections above quoted that the judge of any court of record who is disqualified under the common law would be and is disqualified in this state, even though the disqualification be based on some cause other than those causes detailed in the statute, and that this is equally true whether the judge be a district judge or a Justice of the Supreme Court. It is a maxim of common law, the wisdom and propriety of which will not be questioned, that "no one should be a judge in his own cause." When it is determined that a judge of a court of record is prejudiced in a cause he is incompetent to sit in said cause and the exercise of jurisdiction therein by him in adjudging the issue is beyond his power. It seems to be the weight of opinion in the older states that common law courts had the inherent power to order a change of either the place of trial or the judge for the purpose of securing an impartial trial, and in the matter of transferring the venue or place of trial all the reasoning tends to establish the fact that the end in view is that justice be done the person charged. Apart from authority it is inconceivable that the people of the English race intended at any time to deprive their courts of the power to secure to every citizen an impartial trial before an impartial judge and an unprejudiced tribunal.

"It is the right of every citizen to be tried by judges as free. impartial and independent as the lot of humanity will admit."

In order to assure justice to the litigant no consideration should be allowed to enter the mind of those who are to decide the issue other than the single desire to declare the truth according to the law and evidence.

"A court of general jurisdiction ought not to be left powerless under the law to do within reason all that the conditions of society and human nature permit to provide an unprejudiced panel for a jury trial. * * * The courts of general jurisdiction under such a constitution have the inherent power to do whatever may be done under the general principles of jurisprudence to insure to the citizen a fair trial, whenever his life, liberty, property, or character is at stake. The possession of such power involves its exercise as a duty whenever public or private interest require."

The statements quoted above were made by the court in the case of Crocker et al. v. Justices of Superior Court, 208 Mass. 162, 94 N. E. 369. In that case the question arose over the right of a defendant to a change of venue, but the reasoning applies equally in the case at bar.

In the case of Day v. Day, 12 Idaho, 556, 20 Ann. Cas. 260, the syllabus is as follows:

"Court—Duty to Administer Justice—Constitutional Law. By the provision of the Idaho Constitution (art. 1, sec. 18) that 'right and justice shall be administered without sale, denial. delay, or prejudice,' as well as by the unwritten dictates of natural justice, the courts of the state are commanded to administer justice without prejudice.

"Actions—Change of Venue—Prejudice of Judge—Constitutional Law. The provision of the Idaho constitution that 'right and justice shall be administered without sale, denial, delay, or prejudice,' is self-executing, and the Legislature cannot, by failing to provide by proper legislation that the prejudice of the judge is a cause for a change of the place of trial, nullify the constitutional provision, and thus compel the trial of the case before a prejudiced judge.

"Actions—Change of Venue—Prejudice of Judge. Such provision of the Idaho Constitution makes the prejudice of a judge a ground for his disqualification; and the provision of the state statute (Rev. Stat. 4125) that 'the court may on motion change the place of trial * * * when from any cause the judge is disqualified, from acting,' is broad enough in its terms to include disqualification on the ground of the prejudice of the judge, though the statute was enacted before the adoption of the Constitution.

"Courts—Duty to be Unprejudiced. Public confidence in the judicial system and courts of justice of the state demands that cases shall be tried by unprejudiced and unbiased judges."

We quote from the opinion as follows:

"It is a primary idea in the administration of justice that a judge must not decide judicial matters from bias, prejudice, and partiality, and our Constitution clearly prohibits a judge who has bias or prejudice in a case from trying it. The aim and object of the framers of the Constitution was to preserve judicial tribunals from discredit, and the Supreme Court of Montana referring to this matter in Stockwell v. White Lake Tp., 22 Mich. 341, said: 'The court ought not to be astute to discover refined and subtle distinctions to save a case from the operations of the maxim, when the principle it embodied bespeaks the propriety of its application. The immediate rights of the litigants are not the only objects of the rule. A sound public policy which is interested in preserving every tribunal appointed by law from discredit imperiously demands its observance.' Can it be contended in the face of the command of said provision of our Constitution that the Legislature could legally declare that the bias and prejudice of a judge should be no cause for a change of venue? I think not. And if, in the face of that provision, the Legislature (568) neglects to specify in a statute that the prejudice of the judge is a ground for a change of the place of trial, then the very object and purpose of that provision of the Constitution may be nullified and set at naught. Regardless of the statutory provisions, where such a state of facts appears, as in the case at bar, and a change of place of trial is demanded because of the prejudice of the judge, a change of venue, or at least a change of judges, should be granted to preserve from discredit the judiciary of the state. No technical refinement of argument can convince the people that a prejudiced judge can fairly try a case between his friend and his foe. Such a thing might occur, but the general public would not look upon such a trial as an administration of justice without prejudice. The statute provides the manner, the procedure by which a change of venue may be had, and the procedure there provided is a proper procedure in a case where the application is made on the ground of the prejudice of the judge."

As hereinbefore stated, the Constitution of Oklahoma says: "And right and justice shall be administered without sale, denial, delay or prejudice;" this being the identical language of section 18, art. 1, of the Constitution of Idaho.

The contention is made that respondent filed an application for a writ of mandamus in the Supreme Court of the state of Oklahoma on February 1, 1927, the same being cause No. 18123, and because that application was denied by the Supreme Court, it is binding on this court, and we are now precluded from considering this question. That matter was presented to and considered by a court, the members of which, except Justices Riley and Clark, prior thereto, certified their disqualification in the case at bar. In the cause now before us, presenting the same questions and on identical grounds as the motion which was presented to the Supreme Court, the members of which had disqualified, we hold that the action of the Supreme Court in denying the writ in that case does not preclude the consideration of the application here by this court.

It is earnestly insisted that, even granting that these Justices, Riley and Clark, are under the law disqualified to participate in this proceeding, there is no power vested in the majority of this court to so declare them disqualified, and that they are the sole and only judges of their own qualifications, and that if they abuse this discretion, vested in them by law, the only remedy is by a proceeding for impeachment. This does not appear to us to be the law. Sections 2629 and 2632. C. O. S. 1921, hereinbefore set forth, provide:

"No judge of any court of record shall sit in any cause or proceeding in which he may be interested or in the result of which he may be interested."

Further:

"The same qualifications shall apply to the members of the Supreme Court and the Criminal Court of Appeals as to other courts of record."

The question as to whether or not the majority members of this court may declare an individual member disqualified by reason of interest or prejudice has not been passed upon directly by this court so far as we are able to determine and, in fact, it is a matter that from its very nature seldom arises. Ordinarily, a judge on the first intimation of his disqualification voluntarily withdraws as did the seven judges in this case. However, we find that our position is fortified by authority.

In Trustees of Internal Improvement Fund, Appellant, v. William Bailey, Appellee, 10 Fla. Rep. 213, this question was before the Supreme Court of that state. The case had been originally decided by the Supreme Court of that state, with judges participating, who, it was alleged, were interested and disqualified. The action being one in which the state was concerned, the Legislature enacted a law directing the Attorney General to file an application before the Supreme Court of that state for rehearing. The Attorney General complied with the mandate

of this law, filed the motion, and upon hearing the facts appeared as follows:

The Chief Justice of the court stated that he was not nor is not now a stockholder in said company, and that in the organization of the company he subscribed a certain amount taking certificates of stock payable to his six children, five of these children being minors at the time and that these shares were a gift to his children.

An associate Justice stated that he was a stockholder in a certain railroad alleged to be affected by the opinion at the time the case was decided, but that since the decision, he had transferred his stock to another person.

Under this statement of fact it was submitted for the decision of the court, whether or not these two Justices were disqualified in the case, and also whether or not the Supreme Court had a right to so declare. The court in passing upon these propositions said:

"It is provided in the 5th section of the Act organizing the Supreme Court of Florida, passed the 11th day of January, 1851, 'That whenever, from any cause, any one or two Justices of the Supreme Court are disqualified or disabled from hearing and determining any cause brought before them, it shall be the duty of the Justices of the said court to notify the same to any one or two judges of the circuit court, as the case may be, and at the time and place where such causes shall be set for hearing, and it is hereby made the duty of said circuit judge or judges, upon receiving such notice, to attend at the time and place designated, and he or they shall be and are hereby invested with full authority, in conjunction with the remaining Justice or Justices of the Supreme Court, to hear and determine the causes of which they were notified as aforesaid.'

"By an Act passed the 4th of December, A. D., 1862, entitled 'An act in relation to the qualification of judges,' it is enacted, 'That no judge of any court or justice of the peace shall sit or preside in any cause to which he is a party, or in which he is interested, or in which he would be excluded from being a juror by reason of interest, consanguinity, or affinity to either of the parties; nor shall he entertain any motion in the cause other than to have the same tried by a contempt tribunal.' 2nd. 'That the judge or justice so incompetent, shall retire of his own motion, and without waiting for an application to that effect; that any and all judgments, decrees and orders, made by a judge or judges so incompetent, shall be of no force or validity, and are hereby declared to be null and void, except an order for

the trial of the cause as hereinbefore provided.'

"It will readily be seen that, to render the circuit court judge eligible and competent to sit as one of the Supreme Court, it is absolutely necessary the retiring Justice of the Supreme Court should be disqualified or disabled from hearing and determining the cause. This disqualification must be a legal one, not an imaginary one, nor one of feelings of delicacy, nor of mocked inconsistency, but must be valid in law. Were a circuit court judge to sit in a case in which the retiring Supreme Court Justice was not in law disqualified, a decision made by him would be just as much coram non judice, as it would be where a Supreme Court Justice sits in a cause in which he was disqualified. It is the disqualification of the Supreme Court Justice that authorizes the order for calling in a circuit court judge.

"The Act of December, 1862, in relation to the qualification of judges, is nothing more than what was the law before and has always been so considered in this state, excepting, it may be, in so much thereof as declares judgments, decrees, and orders, made by an incompetent judge, void instead of voidable. Nor is the provision that an incompetent judge shall retire of his own motion, etc., anything but what has been the uniform practice of this court, in cases where the incompetency of the judge for any cause, was clear, certain and manifest; so in cases where there has been a doubt or question as to the disqualification of one of the Justices, the question has been referred to the decision of the court.. This seems to be the practice of other states, where, like our own, no provision is made as to how and in what manner the question of disqualification is to be determined. Such is the course pursued in Tennessee, as will be seen by reference to Waterhouse v. Martin, 7 Peck, 374, wherein the court says it does not rest with the judge alone, whose right to sit is questioned. A proper administration of justice requires that no circuit court judge shall sit in a case where there is no disqualification, as much as it does that no disqualified Supreme Court Judge shall act. There being no mode of determining this question, provided for by statute, we hold that the safest and legal way of determining the same is by a decision of the court, in cases where there is any question or doubt as to the qualification of the judge. The degrees of consanguinity, affinity, and the question as to whether a judge has an interest or not, is one in which the purest and best legal minds may in all honesty differ. Such has been found to be the case in other states, not only as to qualification of judges, but as to competency of jurors and witnesses.

"There is no doubt but that the same objection must lie against a judge as against a juror; because one is to judge of the law,

the other of a fact—Bellows v. Pearson, 19 Johns. 172; Pearce v. Atwood, 13 Mass. 341.

"With jurors, a principal challenge is such that where the cause assigned is such that it carries with it prima facie evident marks of suspicion, either of malice or favor, as that a juror is kin to either party within the ninth degree—that he has been formerly a juror in the same cause—that he has an interest in the cause.—3 Blackstone's Com. 363.

"Interest, in the issue to be tried, is a good and sufficient ground of challenge to a juror; so interest in the question to be determined by a judge in this court, is a good and sufficient disqualification. No man can sit in judgment in his own case. Natural reason and natural justice forbid it, and so does the common law.

"No matter how slight the interest which a juror may have in the issue; if he has any, the common law will not permit him to try the cause—so with a judge.

"Says Lord Mansfield in Hesketh v. Braddock, 3 Burrows, p. 1856: 'The law has so watchful an eye to the pure and unbiased administration of justice, that it will never trust the passions of mankind in the decisions of any matter of right. If, therefore, the sheriff, a juror, or a witness be in any sort interested in the matter to be tried, the law considers him as under an influence which may warp his integrity, or pervert his judgment, and therefore will not trust him. The minuteness of the interest won't relax the objection. For, the degrees of influence can't be measured—no line can be drawn, but that of a total exclusion of all degrees whatsoever'."

It will be observed that under the laws of the state of Florida, it was provided what constitutes disqualification for Justices of the Supreme Court, but no provision was made under the law as to how or in what manner the question of disqualification was to be determined. That court held that the question should be determined by the court the same as any other question properly before it, and we so hold.

In a very early Tennessee case entitled "Waterhouse v. Martin, 7 Peck's Reports, 374," the question of the disqualification of certain members of the Supreme Court of that state by reason of their relationship to parties in the action arose, as well as the question as to the power of the Supreme Court to disqualify these parties therefor, and also as to whether this power was vested solely and only in the judge so affected or in the court itself. The court in the opinion says:

"Having prosecuted a very industrious research into the books, and consulted together upon the consequences of every interpretation, which could possibly be given to the term 'affinity,' as used in the Constitution of this state, as well as into the arguments and reasons which either oppose or maintain the position, that the judges of this court, and not one of them alone, must determine all questions respecting the meaning of every clause and sentence in the Constitution, and laws of the state; two of us have come to the following conclusions:

"That it is the duty of this court, and belongs to it only, to decide the meaning and extent of the term 'affinity,' as used in our Constitution, as it does to decide and fix the meaning of every other term used therein. It is peculiarly proper to fix a standard, in the instance of judges or justices excepted to for affinity, to obviate mistakes in the beginning, and to prevent the litigation which would almost inevitably follow the supposition, that in assuming jurisdiction the judge or Justice had not acted correctly; for whatever course he might take, it would be equally probable in an unsettled state of the question, that he might be wrong. Many lawsuits might spring from this uncertainty, and must continue forever to spring up, till judicially settled by the supreme tribunals of the country.

"These controversies, when brought before this court, must either be settled by the judge alone, who assumed jurisdiction, or by this court, and if by the latter, then eventually this question must be settled by this court, and if ultimately, why not primarily? If ultimately, to correct mischief, trouble and expense, why not in the first instance to prevent them? Why leave every judge to pursue a different course, withholding from all any common standard to which they might all conform, exposing him to complaint, whatever course he may take? Was it the intent of the Constitution, that he should be thus implicated in difficulty? And that the public should be exposed to the danger of his mistakes, and to the confusion which the mistakes of different judges, in the various courts of the country, might occasion? Why should the convention have desired to see such a state of things? Why should it desire that this court should not interfere, and prevent them by a timely exposition? Two judges may not exclude a third from his seat; but they may fix the rule by which his conduct is to be regulated. This court, though it will not say to a justice of the peace or any inferior judge, you shall not sit in any particular cause, may yet set before him the rule, to which it is expected he will conform. And if, in the case of an inferior judge, this court will correct his mistake in assuming jurisdiction, why not, also, the same mistake, committed by a judge of this court, by giving redress to the party injured? And why not ascertain the rule to prevent mistakes, as well for the latter as for the former? The mistakes of the judge

are to be corrected by impeachment, it is said. Will a judge be answerable in any case, for a mistake in judgment, when he has done the best he can? God help us if every error we commit must be the subject of impeachment. The rule of the common law is, that no judge is criminally responsible for an error in judgment; 2 H. P. C. ch 13, sec. 20; 1 Burr. 556, 2 Burr. 785, 1162; 3 I T. 653; nor would the people of this state ever think of making him so, though they might be displeased if he would not express his honest opinion; and then what relief has the injured party, if the judge cannot be impeached and if none but the judge can decide the point which he has apealed from? Suppose this 'favorite' remedy actually resorted to, and the judge, convicted of the error complained of, will the party injured be relieved thereby? Must he not still come to this court for judgment upon the point, in which the error is supposed to be committed? Will the pleasure received from the impeachment be exquisite enough to compensate for the wrong he has suffered? If not, then it is better not to lay, as it were, a trap for the judge, into which he must fall, whatever course he pursue, and not without involving some innocent victim. All this may be prevented by a timely and candid exposition of the dubious sentence, when the assumption of jurisdiction is complained of, and the proceeding is alleged to have been coram non judice, whether of a special judge or of a judge of this court; and upon the coming of that complaint into this court, suppose there are two judges who think the jurisdiction wrongfully assumed, must the opinion of a third, who thinks otherwise, prevail? Must his opinion outweigh that of the other two? If not, then the assumption of jurisdiction in the first instance, without the approbation of the other two, is but the beginning of new controversies, engrafted upon the old one, more embarrassing than the old one. If it must outweigh the others, then a grievous error may be committed, for which there is no redress, and the sufferer can only appeal from him who did the injury to him who did it. The end to which the reasoning employed conducts us is one where great injustice may be done, the judge be not answerable, and redress be placed completely beyond the reach of the sufferer. Either this is the result, or the doubtful point must be settled by a majority of this court, and should be settled in the first instance, rather than in the last resort. * * *

"It is certainly not a forcible argument in favor of the position, that each judge, acting upon his own judgment and each differing from all the others, will render this cause forever undeterminable; it is, on the contrary, the strongest of arguments in refutation of the position unless it be more systematic to have confusion than regularity, and causes of perpetual duration rather than causes to be speedily determined, unless it be better to have uncertainty in the law rather than certainty; and judges impeached for not knowing how to act, rather than judges proceeding regularly by an ascertained rule. If it be better not to have these inconveniences, that reasoning which leads to opposite results, is certainly to be the most approved; and this is, that a common standard should be provided for all the people of this state, judges, justices, and all others, by which to know who shall judge them, and who not; to whom to render obedience and to whom not. And that such standard must be established by the supreme judges of the land, who finally must settle all doubts upon the Constitution and laws of this state."

"This is a point in which a majority of the judges of this court very clearly concur."

It is contended that the rule announced herein as to the disqualification of judges does not apply in contempt cases, that every judge in this state has the sole and exclusive right to hear and determine, in the manner provided by law, all questions of contempt arising in his court. We recognize the force of this argument and agree that, where the disqualification is alleged to and does arise out of matters inherent in the contempt itself, the judge's disqualification may not be urged, but where it appears that the disqualification of the judge is apparent on account of extraneous matters not connected with the contemptuous act itself, the judge may then be disqualified as in other cases.

In the case of Back et al. v. State of Nebraska, 75 Neb. 603, the fourth paragraph of the syllabus is as follows:

"Contempt—Transferring Case. Upon prosecution for contempt in the district court, the judge, before whom the cause is regularly to be heard, may refuse to transfer the cause to another judge of the same court for hearing, unless it is made to appear by due proof that a fair and impartial trial cannot be had before him, or that some other ground for change of venue prescribed by statute exists."

In Lamonte v. Ward et al., 36 Wis. 558, it is said:

"It is stated in the complaint that the case of Lamonte v. Pierce was commenced in the Milwaukee county court; that all of the proceedings in the cause, until after the alleged contempt was committed by Pierce, were had in that court; and that pending an application to punish Pierce for such contempt, the venue was duly changed to the circuit court. It is now claimed, on behalf of the appellants, that such change of venue was without authority of law, and, consequently, that the circuit court never obtained jurisdiction of the proceeding. The statute provides for

the removal from the county to the circuit court of any cause or matter which shall come before the county court or judge, in which the judge shall be interested, or in which he shall have acted as counsel for any party R. S. ch. 117, sec. 59, as amended by ch. 33, Laws of 1862 (Tay. Stats. 1323, sec. 84.) If this proceeding is not a cause within the meaning of the statute, it is, certainly. a matter. and we have no doubt it is within the intention as well as the letter of the statute. The complaint does not state the reasons for the removal of the proceeding to the circuit court, and, in the absence of averment. we must presume, in favor of the regularity of such removal. that it was for one of the causes specified in the statute. It follows that the first ground of demurrer is not well assigned."

The Constitution prescribed that:

"Right and justice shall be administered without sale. denial. delay. or prejudice." Section 6, art. 2, Bill of Rights.

Our interpretation of this provision of the Constitution is that a judge is prohibited from trying a case in which he is prejudiced by or for either party. In Ex parte Ellis. 3 Okla. Cr. 225, 105 Pac. 186, 25 L. R. A. (N. S.) 653, Ann. Cas. 1912A, 863, the court said:

"The framers of our Constitution guarded with special care our judiciary and tried to place it above suspicion of unfairness, passion. or prejudice. so that public confidence in our courts would not be shaken, and provided that right and justice should be administered without prejudice. By virtue of this constitutional provision. who can doubt or question the absolute and unqualified right of the citizen. when called to answer in a court of justice, to demand that his trial shall be before an impartial judge and by impartial jurors? Any other doctrine would place the rights of the citizen which were intended to be protected by this constitutional provision at the mercy or control of the court or judge thereof."

The Supreme Court of the state of Oklahoma construes this section of our Constitution in the case of Son v. Linebaugh, 101 Okla 291. 225 Pac. 686, relative to the disqualification of a district judge. The court, speaking through Justice Nicholson, says:

"While the respondent insists that he is not unfriendly to either of the petitioners, and that he can accord them a fair and impartial trial, and while we do not doubt his sincerity in this regard. yet the question is not so much whether he feels that he would be able to give the petitioners a fair and impartial trial. as whether his utterances and actions preclude reasonable men from feeling that a fair and impartial trial can be had before him. and that he is disinterested in the result.

"(1, 2) Section 6, art. 2, of the Constitution, requires that 'right and justice shall be administered without sale, denial, delay, or prejudice.' The basic principle on which the law rests is that every litigant is entitled to have his rights determined by an impartial and disinterested tribunal, and one that has not prejudged his case. It matters not that a judge is honest, and that he actually believes he can give litigants a fair trial; if he has discussed the merits of a case, and has formed an opinion before a trial, he is bound to enter upon the trial more or less biased and prejudiced. This should not be. Judges should refrain from partisanship in cases pending before them, and should not permit the clamor of the public to warp their judgment. The judiciary is the safeguard of the nation and the state, and the members thereof should so conduct themselves as to inspire the confidence of all, so that every one will feel and know that in the courts their rights will be protected. This confidence cannot exist, if judges persist in discussing out of court the merits of cases pending before them and forming and expressing opinions thereon before a hearing in the orderly course of procedure, and where this has been done the judge should not. in justice to the litigant, insist upon being permitted to sit in the trial of his case.

"In State ex rel. Warner et al. v. Fullerton. District Judge, 76 Okla. 35, 183 Pac. 979, this court said:

"'Courts should scrupulously maintain the rights of every litigant to an impartial and distinterested tribunal for the determination of his rights. All are interested in the integrity. independence, and impartiality of the judiciary, the most important and powerful branch of our government. Judges presiding over the courts should be unbiased, impartial, and disinterested in the subject-matter in litigation, and it is of the utmost importance that all doubt or suspicion to the contrary be jealously guarded against, and, if possible. completely eliminated, to the end that we may maintain and give full force and effect to the high ideals and salutary safeguards written in the organic law of the state. State ex rel. Mayo v. Pitchford, 43 Ok'a. 105. 141 Pac. 433; Yazoo & M. V. R. Co. v. Kirk, 102 Miss. 41, 58 South. 710, 834. 42 L. R. A. (N. S.) 1172, Ann. Cas. 1914C, 968'.

"To like effect are Dennison v. Christopher, 19 Okla. Cr. 467. 200 Pac. 783; Robertson v. Bozarth, 87 Okla. 102, 209 Pac. 742.

"The evidence in the cases at bar convinces us that the respondent has prejudged the petitioners' cases: that he cannot accord to them that fair and impartial trial guaranteed to them by the Constitution and to which. they are justly entitled under the law: and that he should certify his disqualification."

The Oklahoma Supreme Court has rendered a number of decisions which sustain our position. We quote from some of them as follows:

"It is important, not only that this case be tried by a fair and impartial judge, but also that this court shall see to it that no suspicion attach to the course of judicial proceeding, in order that it may be made apparent, in so far as possible, to the community, that the judicial proceedings are impartial and beyond reproach; this to the end that the confidence in our judicial system may be sustained. Under the circumstances surrounding the case pending in Carter county, involving this election contest, it would be impossible for respondent to give to the trial that calm and unprejudiced consideration which would be given a judge wholly separated from the turmoil, and to allow respondent to try this cause under these circumstances would be, in our judgment, to weaken the confidence of the public in the integrity of the court, and this we say, even though respondent should feel in his heart that as to the matters involved he is able to give a fair and impartial trial. We are strengthened in this conclusion by the acts of respondent, since the cause in question came within the jurisdiction of his division of the court." State ex rel. Garrett v. Freeman, Judge of District Court of Carter County, 102 Okla. 291, 229 Pac. 296, 297.

"In order to maintain and foster proper respect and confidence of the people of the courts, the courts must be presided over by unbiased, impartial, and disinterested judges, and all doubt and suspicion to the contrary must be jealously guarded against. McCullough v. Davis, 11 Okla. Cr. 431, 147 Pac. 799; State ex rel. Warner v. Fullerton, 76 Okla. 35, 183 Pac. 979; Dennison v. Christopher, Superior Judge, 19 Okla. Cr. 467, 200 Pac. 783." Schulte v. Bolen, District Judge, 90 Okla. 238, 216 Pac. 928.

"Moreover, the state has an interest in the standing, integrity, and reputation of its courts, and, when constitutional or statutory provisions forbid a judge from acting officially, his action is regarded as transgressing the public policy of the state. Such prohibitions are plainly intended, not only for the benefit of the parties to a suit, but for the general interests of society, by preserving the purity and impartiality of the courts and fostering the respect and confidence of the people for their decisions." 15 R. C. L. 530.

"We are not unmindful of the fact that the practice of disqualifying trial judges on the grounds of bias or prejudice may be subject to much abuse. Captious and unwarranted accusations of bias should be discouraged. On the other hand, much of the adverse criticism against the courts of this state may be traced to the interest, real or apparent, shown by trial judges either in the

subject-matter of the suit or the ultimate judgment to be rendered in particular cases. And in order to foster confidence in the integrity and impartiality of courts, a presiding judge should be compelled to certify his disqualification where it appears probable that such judge would not afford the defendant a fair trial." Dennison v. Christopher, Superior Judge, 19 Okla. Cr. 467, 200 Pac. 783, 784.

We therefore hold that this court has the power, and it is its duty to consider this petition for a writ of mandamus on motion of respondent to disqualify these Justices of the Supreme Court from trying this case.

Second: Upon the record are these Justices, or either of them, disqualified from trying this case?

In considering this matter relative to Justice Riley we find that respondent says, and it is not denied, that there is now pending and has been pending for some months a certain action in the district court of Oklahoma county, Okla., wherein Justice Riley is plaintiff and in which he seeks to recover from O. O. Owens the sum of $200,000 damages because of an alleged libel; that respondent in this court is counsel in said cause for the said O. O. Owens.

As to said Justices respondent further says that there is now pending in the district court of Tulsa county, Okla., certain action wherein O. O. Owens is plaintiff and these Justices are defendants and wherein said Justices are sued for $100,000 damages alleged to have been occasioned said O. O. Owens on account of the fraud of said Justices Clark and Riley in causes before them as members of this court.

The allegation is made that the opinion of the Supreme Court in cause No. 13646 was written, prepared, and filed by Justice Clark, and was published as the opinion of this court, wherein it was shown that Justice C. W. Mason concurred, when in truth and fact said Justice Mason did not concur therein. That all of these suits are closely interwoven and grow out of decisions which were participated in by Justices Clark and Riley, and that respondent herein, H. B. Martin, is sole counsel for the said O. O. Owens in all of these pending causes. It is also to be noted that the citation in the case at bar was issued against both H. B. Martin, respondent herein, and O. O. Owens. The trial of one will necessarily involve the rights of the other. They are in fact joint defendants in this cause.

Respondent's answer to the charge is that

he believes the facts stated in his motion are true. In the hearing of this case, as we view it, this court must pass upon the truth of respondent's allegations in his answer. It seems to us that the circumstances would require these Justices to pass upon the merits of cases in which they are interested.

It is a matter of common knowledge that this litigation has been aired before the people of this state to a considerable extent. In view of the conditions as hereinbefore set out, are these Justices prejudiced or interested to such an extent as to probably prevent that fair consideration, which should be given by a judge to the interest of a litigant appearing before him? In view of the decisions of this court and the Criminal Court of Appeals of this state, to which we have referred herein, as well as the courts of other states, we answer this question in the affirmative. With the interest of these Justices in the litigation pending both in the suit in Tulsa county and the suit by Justice Riley in Oklahoma county and the allegations made therein, and the allegations made in respondent's answer herein, it is only reasonable for the ordinary mind to conclude that they are interested in the litigation now before us to the extent that they could not give that free, impartial and unbiased consideration to the respondent herein due every litigant in this court. It may be said that respondent is simply acting as attorney for O. O. Owens in all of this litigation and for that reason these Justices could have no prejudice against him, but, as is well known, the rule is for the attorney to make his client's case his case and as lawyers we know that the allegations in a pleading, after all the subject-matter is sifted and gone over, are as a rule confined to those allegations which the attorney decides are material. The attorney's interest is so closely interwoven with his client's interests that the result of the case affects the attorney, and this fact is well known to all lawyers, as well as judges, and the charge is a joint charge involving the joint acts of Owens as well as respondent. In the case of Knickerbocker Ice Co. v. Gray, 165 Ind. 140, 72 N. E. 869, 6 Ann. Cas. 607, note page 610, it was held that a stenographer of an attorney of one of the parties to an action was disqualified by interest from writing the deposition of a witness for use on the trial. In this case at bar if Justices Clark and Riley participate they will be called upon to decide an issue, which might vitally affect the result of the litigation in Tulsa county and in Oklahoma county now pending between these Justices and the client of respondent, wherein respondent is the only attorney engaged in behalf of his client. In Juliana v. State, 167 Ind. 421, 79 N. E. 359:

"The appellant, pursuant to a statute, was granted a change of judge in a criminal proceeding. At that time it was necessary for the regular judge to appoint the special one to hear the cause. A statute then in force denied a defendant more than one change of judge. Section 2078, Burns 1908. The regular judge appointed, as special judge an attorney who had been consulted by appellant for employment as his attorney, but who was never so employed. The appellant, notwithstanding the one change procured by him, objected to the appointment because the appointee was not disinterested. In reversing the judgment of conviction, and vacating the appointment of the special judge, the court quoted approvingly from Joyce v. Whitney, 57 Ind. 550, 554, as follows:

"'Judges are by no means free from the infirmities of human nature, and therefore it seems to us that a proper respect for the high positions they are called upon to fill should induce them to avoid even a cause for suspicion of bias or prejudice, in the discharge of their judicial duties.'"

These cases are cited in the case of State ex rel. Williams v. Ellis (Ind.) 112 N. E. 98. In the case of State ex rel. Linde, Atty. Gen., v. Robinson et al., 160 N. W. 512, being from the Supreme Court of North Dakota, the court said:

"As it appears that the determination on the merits of this controversy may affect the tenure of office of Associate Justices Bruce and Christianson, they signify their desires to be relieved from participating in a hearing of the merits of the controversy, if they can be permitted to be so relieved.

"'It is now a universally recognized principle that a person cannot be a judge of his own cause, and any interest in the subject-matter of a suit will disqualify a judge to preside on the trial thereof. Authority to preside in his own cause cannot be conferred by positive enactment. And, however broad the grant of judicial power may be, this rule remains operative, and gives rise to a tacit exception from the general words of the grant. But jurisdiction may be conferred where the interest is not direct, but remote; is not certain and palpable, but contingent and problematical; is not great and important, but minute.' 23 Cyc. 576.

"The celebrated jurist, Judge Cooley (Cooley's Constitutional Limitations, pp. 592, 593) says:

"'No one ought to be a judge in his own cause; and so inflexible and so manifestly just is this rule that Lord Coke has laid it

down that "even an act of Parliament made against natural equity, as to make a man a judge in his own case, is void in itself; for 'jura naturae sunt immutabilia,' and they are 'leges legum.'" This maxim applies in all cases where judicial functions are to be exercised, and excludes all who are interested, however remotely, from taking part in their exercise. It is not left to the discretion of a judge, or to his sense of decency, to decide whether he shall act or not; all of his powers are subject to his absolute limitations; and when his own rights are in question, he has no authority to determine the cause. * * * Accordingly, where the Lord Chancellor, who was a shareholder in a company in whose favor the Vice-Chancellor had rendered a decree, affirmed this decree, the House of Lords reversed the decree on this ground, Lord Campbell observing: "It is of the last importance that the maxim, 'No man is to be a judge in his own cause,' should be held sacred. And that is not to be confined to a cause in which he is a party, but applies to a cause in which he has an interest." "We have again and again set aside proceedings in inferior tribunals, because an individual who had an interest in a cause took part in the decision.' And it will have a most salutary effect on those tribunals, when it is known that this high court of last resort, in a case in which the Lord Chancellor of England had an interest, considered that his decree was on that account a decree not according to law, and was set aside. This will be a lesson to all inferior tribunals to take care, not only that in their decrees they are not influenced by their personal interest, but to avoid the appearance of laboring under such an influence.'

"That the interest of Justices Bruce and Christianson is not so direct as to disqualify them from participating in the merits of this controversy is supported by a very high authority. See Duncan v. McCall, 139 U. S. 449, 11 Sup. Ct. 573, 35 L. Ed. 219; 23 Cyc. 579. But in this state the Justices of this court have refrained from sitting (even though not legally disqualified) in cases wherein it might appear that they had any interest whatever. Thus, in many states trial judges subsequently elected members of appellate courts are permitted to, and do, sit in review upon their own judgments. 23 Cyc. 588, 589. This, however, has never been done in North Dakota. This court has constantly recognized not only the duty of rendering righteous and honest judgments; it has, also, recognized that:

" 'Next in importance to the duty of rendering a righteous judgment is that of doing it in such a manner as will beget no suspicion of the fairness and integrity of the judge.' People v. Suffock, 18 Wend. (N. Y.) 550.

"This declaration has met with the approval of many American courts. See In re Conant, 102 Me. 477, 67 Atl. 564, 120 Am. St. Rep. 512. Consequently, while Justices Bruce and Christianson are not legally disqualified from participating in a hearing and determination of the merits of this controversy, it is the unanimous opinion of the entire court, as now constituted, that in order to comply with the highest principles of the ethics of the bench, they should be excused from so participating, if they can be legally permitted to do so."

The question of the interest of a judge in litigation depends upon the circumstances of each case.

In Gill v. State, 61 Ala. 169, the court says:

"According to the stern morality of the common law, a judge is required to be legally indifferent between the parties. Any, the slightest, pecuniary interest in the result disqualifies."

And the same court, in Ex parte Cornwell, 144 Ala. 497, 39 South. 354, says:

"Any interest, the probable and natural tendency of which is to create a bias in the mind of the judge for or against a party to the suit, is sufficient to disqualify. The judge is human, and human nature at best is weak, and as far as it is possible a perfect equipoise should always be preserved in the administration of justice by the courts. Pecuniary interest in the result of the suit is not the only disqualifying interest."

"In Medlin v. Taylor, 101 Ala. 239, 13 South. 310, the probate judge, whose qualifications to sit in the cause were under review, was held not to have any disqualifying interest in the result of the case within the provisions of the Constitution or statute. He had, however, a personal interest in the similarity of the contest then being heard, and that of his own pending in the circuit court, and the opinion concludes: 'It is the opinion of the court, however, that under the doctrines of the common law, aside from our constitutional and statutory provisions, he had such a personal interest in the questions involved in the contestation of Medlin,—in the nature of things, such a bias in favor of one of the parties of the case.—as disqualified him to hear and determine the same, and justified his action in declining so to do.' See, also Bryce v. Burke, 172 Ala. 219, 55 South. 635.

"In Moses v. Julian, 45 N. H. 34, 84 Am. Dec. 118, is the following pertinent language: 'It is the right of every citizen to be tried by judges as impartial as the lot of humanity will admit' This is but the expression of a well-known rule of universal justice everywhere recognized. * * * It is one of the great principles of the common law, for which the people of England had struggled for ages, and which they ultimately succeeded in establishing against the strenuous efforts of a tyrannical government. We can have no higher authority than this for de-

nc.uncing as illegal everything which interferes with the entire impartiality of every legal tribunal." State ex rel. Miller v. Aldridge, 212 Ala. 660, 103 South. 835.

Having in mind the litigation and charges hereinbefore set forth, the issues joined therein, the inevitable interest of these two Justices in the final outcome thereof, together with the fact that the respondent as a member of the bar of this court has been and now is active counsel for O. O. Owens in all such pending litigation and is here jointly charged with O. O. Owens for contempt of this court, we are of the firm and fixed opinion that Justices Clark and Riley are, within the law of this state, in fact disqua ified to try respondent in such a manner as will bring no suspicion of the fairness and integrity of the court and its decision in this cause.

We do not doubt the conviction of each of these Justices that they can give a fair and impartial trial herein, but our conclusion reached herein is not only for the benefit of respondent, but for society in general in preserving the impartiality of the courts and fostering the respect and confidence of the people for their decisions. Therefore, the prayer is granted. Justices Clark and Riley, having been advised of our views herein expressed. have complied therewith, and consequently there is no occasion for the writ to issue.

HUETT, THOMPSON, BROWN, and SWANK, JJ., concur.

HENRY. V. C. J., and LEWIS, J., CLARK and RILEY, JJ., dissent.

HENRY, Special Vice Chief Justice (dissenting). I am unable to concur with my brother associate Justices in this case that the writ of mandamus should issue to disqualify two members of this court, Justices Riley and Clark. Therefore, I feel it my duty to say why I dissent. This is so ely a contempt case, and nothing more. Therefore, can a judge of a court of record, be it an inferior court, or any member or members of the Supreme Court of the state of Oklahoma, be disqualified? I answer in the negative.

There are no property rights involved, and neither is contempt of court, either under the Constitution or laws of Oklahoma, a crime. If it were a crime. then by right the accused would be entitled to a jury trial. However, a contempt case is punishable as a crime, under section 2291, C. O. S. 1921. It is a well-settled rule that the power of a court of record to punish for contempt is inherent in the court. No case has been presented to this court that in a contempt case for any cause the judge is disqualified to hear and determine it, and I am unable to find any case that so holds. It is said in 13 C. J., paragraph 83:

"Since no court except that against which a contempt is committed has power to punish it, the general rule is that a party accused of contempt is not entitled to a change of venue."

Then at page 52, paragraph 69, same vol. C. J.:

"Since contempt proceedings are substantially criminal in their nature, one court is not authorized to punish a contempt against another court or judge, unless such other court or judge is an agency or part of the court inflicting the punishment, as, for instance. where the court is composed of several divisions, or as in the case of a referee, or the like. * * *"

It was held in Clay v. Walters (Fed.) 21 Am. & Eng. Anno. Cas. 897:

"Contempts are of two classes; 'criminal contempts.' which are prosecuted to preserve the power and vindicate the dignity of the courts and to punish the offender, and 'civil contempts,' which are prosecuted to preserve and enforce the rights of private parties and to compel obedience to orders and decrees to enforce the rights and administer the remedies to which the court has found them to be entitled." See McKee v. De Graffenreid, 33 Okla. 136, 124 Pac. 303.

To illustrate: If A. and B., who are avowed enemies of a trial court of record, or any member or members of the Supreme Court, are by their acts and conduct in open court in contempt of that court, they cannot disqualify the judge or judges for bias or prejudice or interest, ill will or hatred, because they themselves brought about the contempt, well knowing at the time of the enmity that existed between them; therefore the judge or judges of that court are not disqualified to hear and determine the contempt case for the further reason the court is the object of the contempt, it is an offense against the court as an organ of public justice they must preserve the dignity of the court, contempt being a summary action.

It was said in Lamberson v. Superior Court of Tulare County, 91 Pac. 100 (a California case):

"Nor is the judge disqualified from sitting in a contempt proceeding. Petitioner's theory on this regard, if we understand it, is that the judge is disqualified from hearing the proceedings in contempt, because the

contempt itself consists in imputations upon his motives, and attacks upon his integrity. **Such is not and never has been the law.** The position of a judge in such a case is undoubtedly a most delicate one, but **his duty** is none the less plain, and that **duty commands that he shall proceed.** However willing he may be to forego the private injury, the obligation is upon him by his oath to maintain the respect due to the court **over which he presides."**

As was said again by the Chief Justice of this same court in Re Philbrook, 105 Cal. 471, 38 Pac. 511:

" 'The law which in such cases makes us the judges of offenses against the court places us in an extremely delicate and invidious position, but it leaves us no alternative except to allow the court and the people of the state, in whose name and by whose authority it acts, to be insulted with impunity, or to exercise the authority conferred by law for the purpose of compelling attorneys to maintain the respect due to the courts of justice and judicial officers.' Were the rule otherwise, so that it was required that another judge should be called in to sit in the proceedings, the recalcitrant offending party would need only to insult such judicial officer in turn until the list was exhausted and thus, by making a farce of legal proceedings, go scatheless and unpunished."

One of the very latest decisions on the question to disqualify a judge in a contempt proceeding is found in 69 L. Ed. at page 517, Cook v. the U. S., a case from Ft. Worth, Tex. Chief Justice Taft, writing the decision of the court, stated:

"A judge of a court of record in a contempt action is not disqualified to hear and determine the case."

This case is in point with the one at bar; then, under this case, I hold no member of this court is disqualified.

Construing article 2 of section 6, Constitution of Oklahoma, and sections 2629 and 2632, C. O. S. 1921, together as to disqualification of judges of any court of record, it does not apply in contempt cases, in my opinion, but may apply to all other character and kind of cases; but as that question is not before the court, I express no opinion.

It seems well settled that one charged with contempt of court is not entitled to a change of venue from the judge, for the reason, as I view it, a judge having the inherent right to try and determine contempt cases, should not lose jurisdiction by a change of venue.

It was said by the learned judge in a case from Indiana, in Coons v. State, 134 N. E. 194:

"One charged with contempt of court is not entitled to change of venue from the judge."

Then we find from the Supreme Court of Ohio, in Myers v. State, 46 Ohio St. 491, 22 N. E. 44:

"The statute clearly authorizes, as did the common law, courts to punish summarily, as contempts, acts calculated to obstruct their business. They could not be maintained without such power, nor could litigants obtain a fair consideration of their causes in a court where the jury or judge should be subject, during the trial, to influences in respect to the case on trial, calculated to impair their capacity to act impartially between the parties. Nor is there serious danger to the citizen in its exercise. Power must be lodged somewhere, and that it is possible to abuse it is no argument against its proper exercise. But we think the danger more imaginary than real."

I am further of the opinion that the two prior decisions of this court for a writ of mandamus, in cases numbered 18080 and 18123, are binding on this court. In those cases the writ was denied in each case to disqualify two members of this court, Justices Riley and Clark. For the reasons stated in this opinion and the decisions cited, I dissent, and I am authorized to say Mr. Justice Lewis concurs in this dissenting opinion.

RILEY, J. (dissenting). I cannot concur in the opinion by which a writ of mandamus was issued to Justice Clark and myself compelling us to certify our disqualifications to sit in this cause.

In obedience to said writ I did, on the 4th day of February, 1927, so certify my disqualification to His Excellency, the Governor, as I was commanded to do.

The material facts are as follows:

On the 13th day of January, 1927, the respondent Martin, who had been formerly cited for contempt by the Supreme Court of Oklahoma, in this proceeding filed a motion to disqualify six certain Justices of this court, including myself and Justice Clark. As to myself, the grounds alleged were: (1) That he, the respondent, was attorney of record of one Owens in various litigation growing out of cause No. 13646, known as the Riverside Oil Case; (2) that Owens, his client, had sued me (because of my concurring in an opinion against him), and I had sued Owens, his client, because I conceived that he had libeled me in an article published in the Tulsa World.

This contempt proceeding against Martin,

sole, grew out of a pleading filed in this court by him, and he is charged in effect with having thereby insulted, by scurrilous statements therein, Mr. Justice Mason and this court in denying the validity of the judgment and opinion of this court in cause No. 17409, an ancillary action to the Riverside Case.

On the 13th day of January, 1927, in this cause No. 18080, there was filed a motion to disqualify certain Justices of the Supreme Court of Oklahoma, including Justice Clark and myself. Said motion on said date was by said court overruled, and on said date I caused to be filed in said cause a statement wherein it was said:

"If in fact a contempt has been committed upon and against the Supreme Court, of which I am a member, in this cause, it is a direct contempt and it is my duty to dispose of it."

Thereafter, on the 1st day of February, 1927, there was filed in said Supreme Court in cause No. 18123. by the respondent, Martin, a motion and application for writ of mandamus seeking to compel Justice Clark and myself to certify our alleged disqualifications in cause No. 18080, which said motion and application was by said court, on the 2nd day of February, 1927. after hearing thereon, denied, Justice Clark and myself not participating therein.

On the 13th day of January, 1927, seven Justices of the Supreme Court desiring not to participate further in cause No. 18080, and having voluntarily certified their disqualifications to sit further, and seven appointments of members of the bar having been made by the Governor, in accordance with law, to sit in cause No. 18080, and on the 2nd day of February, 1927, the Supreme Court in said cause being so constituted, there was again filed by said respondent in cause No. 18080 a motion to disqualify Justice Clark and myself, which said motion on said 2nd day of February, 1927, was by said court considered and overruled. Thereafter, on the 3rd day of February, 1927, there was again filed in said cause No. 18080, a motion and application for writ of mandamus which sought to compel Justice Clark and myself to certify our alleged disqualifications in said cause, which motion and application for writ of mandamus was by a majority vote of said honorable court granted, and in open court the clerk of the Supreme Court was directed to issue said writ of mandamus to Justice Clark and myself, directing and compelling us to certify our disqualifications.

I take it that the majority opinion is based, as to procedure, upon section 2632, Compiled Oklahoma Statutes 1921. which is as follows:

'No Justice of the Supreme Court of this state or judge of the Criminal Court of Appeals shall participate in the decision of any cause in such court appealed thereto from a lower court of said state, in which court such justice or judge was judge presiding at the trial of such cause; and the same qualifications shall apply to the members of the Supreme Court and Criminal Court of Appeals as to other courts of record; and whenever any member of either of said courts is disqualified, the same shall be entered of record in such court and such disqualifications of such member shall forthwith be certified by the clerk of such court to the Governor of the state, who shall appoint some members of the bar of the state, possessing the same qualifications as the members of such court, to sit as special judge in said cause."

Considering particularly the clause therein contained "and the same qualifications shall apply to the members of the Supreme Court and Criminal Court of Appeals as to other courts of record," it manifestly refers and relates to section 2629, Compiled Oklahoma Statutes 1921, which is as follows:

"No judge of any court of record shall sit in any cause or proceeding in which he may be interested. or in the result of which he may be interested, or when he is related to any party to said cause within the fourth degree of consanguinity or affinity, or in which he has been of counsel for either side, or in which is called in question the validity of any judgment or proceeding in which he was of counsel or interested, or the validity of any instrument or paper prepared or signed by him as counsel or attorney, without the consent of the parties to said action entered of record: Provided, that the disqualifications herein imposed shall not exclude the disqualifications at common law."

I shall consider these sections of the statute in pari materia. I desire particularly to analyze "an interest." There is no contention that I am related to any of the parties within the fourth degree of consanguinity or affinity, etc., as contained in said section, or that I have been counsel for either side, or that as counsel or attorney I have prepared an instrument or paper the validity of which is being questioned. nor in fact is the validity of any paper being questioned.

What is an interest such as would disqualify a Justice of the Supreme Court in a civil or criminal cause or proceeding pending before him?

Can it be said that should the respondent be acquitted it would affect in any way a suit brought by his client, Mr. Owens, in the district court of Tulsa county against Justice Clark and myself? Or could it affect in any way a suit brought by myself in the district court of Oklahoma county against Mr. Owens and others? Could it be said that if the respondent is found guilty of contempt, that such finding would in any way affect Justice Clark or myself, or the respondent, or his client in such suits as above mentioned? Should the resopndent be fined and required to pay a sum of money, would Justice Clark or myself receive a penny of said fine? Should he be otherwise punished, how would it inure to our benefit?

Neither the Constitution, the statute, nor the common law recognizes an imaginary interest in the result of lawsuits.

The English practice was commented on in the case of Ex parte Fairbank Co., 194 Fed. 978, as follows:

"At the common law substantial or direct interest in the event of litigation, or close ties of blood or affinity, were the only causes of disqualification of a judge. * * * These are the only causes for the disqualification of a judge under the common law of England as now administered in England." Fulton v. Longshore, 156 Ala. 611, 46 South. 989.

Hence at common law a judge could not be recused in even civil or criminal matters because of bias or prejudice alleged or proven.

This is an action in the name of the state of Oklahoma against respondent, the result of which can only inure to the benefit of the people of the state of Oklahoma. It is the right of the people to cause their courts to be treated with respect. It is the public interest, and not the personal pride of the judges, which establishes this inherent power of courts to punish for contempts. It is the public will that they command respect and obedience to their lawful orders and mandates; without that right and will enforced the law would become a dead letter and fraud and violence would prevail. As judges of this court we would be unmindful of our trust, we would become traitors to the people, if we did not demand the respect due a judicial tribunal over which we have been commissioned to preside by the sovereign citizens of the state of Oklahoma.

Rapalje on Contempts, p. 110, states:

"It may safely be laid down as a general rule that statutory provisions relative to change of venue have no application to proceedings to punish contempts, unless such proceedings are expressly included eo nomine, in the written law."

The Supreme Court of the United States in Bessette v. Conkey, 194 U. S. 324, 48 L. Ed. 1005, laid down the rule in a contempt case that a contempt is neither civil nor criminal in fact, but sui generis. These words are used by Mr. Justice Brewer, who delivered the opinion:

"A contempt proceeding is sui generis. It is criminal in its nature, in that the party is charged with doing something forbidden, and, if found guilty, is punished. Yet it may be resorted to in civil as well as criminal actions, and also independently of any civil or criminal action."

And further:

"It is true they are peculiar in some respects. rightfully styled sui generis. They are triable only by the court against whose authority the contempts are charged."

See O'Neil v. United States, 190 U. S. 36, 47 L. Ed. 945, 23 Sup. Ct. 776.

Contempt is not a crime in the state of Oklahoma, for in addition to the general rule as expressed by the Supreme Court of the United States and uniformly followed in the absence of governing constitutional or statutory provisions, we have, first, a statute, section 2291, Compiled Oklahoma Statutes 1921, which provides:

"A criminal act is not the less punishable as a crime because it is also declared to be punishable as a contempt"

—thus recognizing a complete and clear distinction between acts which may constitute a crime and acts which constitute a contempt. Second, by section 20, article 2, of the Constitution,

"In all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury in the county in which the crime shall have been committed."

To paraphrase: "In all criminal prosecutions the accused shall have the right to a trial by an impartial jury." Thus, if contempt is a crime, the accused is entitled to a jury trial. The section is all embracing. But the framers of the Constitution clearly intended that contempts should not be classed as crimes, for by article 2, section 25, they specifically left to the Legislature the duty of defining contempts and the duty of regulating the proceedings and punish-

ment in matters of contempt, and provided a jury trial, as to the guilt or innocence of the accused, only in case of a person being accused of violating or disobeying, when not in the presence or hearing of the court, an order of injunction or restraint. Thus clearly considering contempts separate and apart from crimes.

In Ex parte Fisk, 113 U. S. 713, 28 L. Ed. 1117, 5 Sup. Ct. Rep. 724, it is said by the Supreme Court of the United States in a contempt case:

"This principle has been uniformly held to be necessary to the protection of the court from insults and oppression while in the ordinary exercise of its duties, and to enable it to enforce its judgments and orders necessary to the due administration of law and the protection of the rights of suitors."

I am interested to the extent that the honor and dignity of this court shall be respected. That the orders and mandates of this court shall be obeyed. And when in the course of duty, under my commission from the people, it becomes necessary by contempt proceedings or otherwise to protect the property rights of the citizens of this state as against pirates on the high seas of business, when even and exact justice has been done as between litigants, then to that extent and to that extent alone am I interested.

An interest sufficient to disqualify a judge is well considered in a case presented by counsel for the respondent, Trustees Int. Imp. Fund v. William Bailey, 10 Fla. 213. The last paragraph of the syllabus is as follows:

"A judge. as well as a juror, must be immediately interested in the very issue in question, which interest must not be uncertain or speculative. A mere speculative possibility of such an interest is no sufficient ground for a principal challenge to a juror or judge."

In the case of Sanborn v. Fellows, 22 N. H. (2 Foster) 481, there was a relative of the judicial officer who was related to one of the parties.

In the case of Fowler v. Byers, 16 Ark. 196. the Supreme Court of that state decided that a circuit judge was not disqualified to preside where he was related by affinity within the constitutional degrees to one of the parties in the cause who was merely a trustee.

It is said in the case of Trustees Int. Imp. Fund v. Bailey, supra:

"Does a speculative interest—which may or may not exist one way or the other, as in this case, for it cannot be known whether the company would be most benefited if the fund were or were not enjoined upon the application—enter the mind of the judge so as to influence him?

"How could he be influenced, when he neither knows, nor can know, how he is to be benefited?

"The interest which disqualifies is a legal interest, certain and dependent on the result of the case."

And the said case is concluded by saying:

"It must be obvious that the interest of the said railroad company, in the case at bar, is speculative and uncertain. The said road having no interest in the result of this suit, or the issue presented. it follows that the said Chief Justice and said Associate Justice are not disqualified to sit in this cause, and hear and determine the matters in issue: and, as they are not disqualified, a circuit court judge would not be competent to sit."

"The order for calling in circuit court judges cannot, in law, be made."

In the last cited case the two Justices of the Supreme Court, as shown on p. 227, severally submitted for the decision of the court whether under this statement of fact an order should be made calling in two circuit court judges to sit on the hearing of the application. And it is said on p. 228:

"It will readily be seen that to render the circuit court judge eligible and competent to sit as one of the Supreme Court, it is absolutely necessary the retiring Justice of the Supreme Court should be disqualified or disabled from hearing and determining the cause. This disqualification must be a legal one, not an imaginary one, nor one of feelings of delicacy. nor of mocked inconsistency, but must be valid in law."

In that case the Supreme Court of Florida did not say that the Justices questioned were incompetent to sit. In fact they held that the circuit judge who had been drawn in to sit was incompetent by reason of the fact that the justices were competent. It. was the circuit judge's right to sit that was questioned and the Supreme Court of Florida therein proceeded by request of the Justices challenged to determine what an interest was that ought under the law to disqualify a judge.

In Waterhouse v. Martin, Peck's Reports, vol. 7, p. 374. likewise cited by counsel for respondent, wherein there were three judges comprising the Supreme Court of Tennessee, and wherein their Constitution provided

by article 5, section 8: "No judge shall sit on the trial of any cause where the parties shall be connected with him by affinity or consanguinity, except by consent of parties," that court proceeded to define the term "affinity" and the limits to which it applied as affecting the interest of a judge. It was said, p. 376:

"The objection to a judge for being connected by affinity with one of the parties need not proceed from either of parties, for he is ipso facto disqualified by the Constitution. till both parties agree that he shall sit."

Mr. Moss, counsel for respondent, on p. 48 of the record of this proceeding, in speaking of this Tennessee case, said:

"The disqualified member had rendered a written opinion, holding that he was not disqualified, and the other two members, without any constitutional or statutory authority, upon rehearing, held that the member who had adjudged himself to be qualified was disqualified."

Counsel in said contention made a false statement of fact and of law in this, to wit: (1) No member of the said court was ever disqualified in said case. (2) There was no rehearing reported in the case; the opinion was a composite one after the early English fashion. (3) Two other members of the court did not write any opinion wherein it was held that the member who adjudged himself qualified was disqualified.

I do not care to comment upon the attorney's statement as to what this case held; it speaks for itself.

The Supreme Court of Tennessee in that case held that the exceptions made to Judge Haywood by reason of the fact that a litigant was connected with him by affinity were not valid and that the judges present could constitutionally and legally form a court for the decision of the subject-matter of the litigation.

The Constitution of Tennessee did not fix the degree, but left it to the court to determine the degree of affinity necessary to exclude a judge (p. 380).

In the Waterhouse Case it is said:

"If Judge Haywood (Justice of the Supreme Court) was incompetent, by reason of the affinity, Judge McKinney (Judge called to sit) was competent under his commission, to fill the court; and vice versa, acting either way, an error might be committed, and the judgment rendered, should there be one, stand not only as a monument of the imbecility of the court, who improperly might act, but involve officers and the judges making it, in difficulties."

Judge Whyte, on page 382 of the opinion, said:

"This is the mandate of the people of Tennessee to every judge of the state, given by the most solemn of instruments, the Constitution, and in its nature it must be a mandate directed to him personally, to be executed by him according to his own judgment, and not dependent on the judgment or opinion of others. If the import of the mandate is dubious, as the argument at the bar on its construction implies, the very nature of the office of judge recognizes no superior or intermediate power between the mandate and himself, under, or by means of which, a construction of it is to be given for his government, or by which his judgment therein may be directed, controlled, or superseded. Its execution is likewise personal and solely with himself, and incapable of being resisted by the interposition of others, or of being omitted, and its omission excused or justified by the like interposition. As he is the sole judge, so he has the whole responsibility. If, in this respect, he disobeys or transgresses the Constitution, he is answerable by impeachment, and it would be an argument addressed to the mercy, not to the justice, of the court of impeachment, that such and such was not his own judgment and act, but the judgment and act of two other judges of equal powers and authority."

On page 383, it is said:

"The present question is, Have you a court; have you one, two, or three judges; or have you any judge to constitute this court? No property depends on this question at present, but judge or no judge depends upon it, and it can only be solved by the judge himself, and that upon his own responsibility, whether he is so or not by the Constitution."

On page 384, the same being the addenda to the opinion delivered the next day, on further argument there was pointed out the manner in which objections to a judge might be stated and the manner in which the individual judge of his own motion might, if in fact he was legally disqualified, so certify his disqualifications.

On page 385, it said he cannot be disqualified by the opinions of others. It is his duty to sit by his own judgment alone, upon his own responsibility. It never would do, on the one hand, for a judge to shrink from a duty and shelter himself under an opinion of a majority allowing his disqualifications, or, on the other hand, to be driven from the discharge of his duty by the opinion of a like majority denouncing him disqualified.

"Many cases might be put, but which I deem unnecessary, to shew, that if a majority has the physical power of qualifying or disqualifying the minority, there is no calculating the consequences. By this mode, a judge might be compelled to sit upon, and adjudicate, the cause, when his own son, or his own father, is a party. These are extreme cases, it is true, and not likely to happen, but they are within the principle. and being so, they are the best kind of cases to test the correctness of that principle, for they present it naked and undisguised, free from those softening circumstances, which in less strong cases, might veil its innate deformity, but that, at some time or other, on a proper occasion, would produce the most baneful effects on society."

On page 386 of said cause it is stated that, in a subsequent part of the term, when the cause was about to be called, Judge Haywood delivered the final opinion of Judge Peck and himself as follows:

"That it is the duty of this court, and belongs to it only, to decide the meaning and extent of the term 'affinity,' as used in our Constitution."

It is said in the final opinion of that court, p. 386:

"Two judges may not exclude a third from his seat; but they may fix the rule by which his conduct is to be regulated. This court, though it will not say to a justice of the peace or any inferior judge, **you shall not sit in any particular cause,** may yet set before him the rule, to which it is expected he will conform."

They fixed the rule of affinity (p. 389), and the extent to which it would apply (p. 391) by saying:

"There is no name for the degrees of relationship between the consanguinei of the wife and those of the husband; because there is no such relationship to be counted."

So that the judge so challenged might govern himself accordingly and at his peril. They concluded by saying:

"We are therefore of opinion that the spirit and meaning of the term 'connected with him by affinity,' used in the Constitution, ought not to be extended beyond the definite meaning which it has in writs. statutes, and other legal instruments; that the exceptions made to Judge Haywood are not valid, and that the present judges can constitutionally and legally form a court for the decision of this cause."

The decision of the court on the subject-matter of the litigation was rendered by Judge Haywood. so challenged. Neither the Florida nor the Tennessee citation concerned a contempt.

I here say that neither case cited by counsel for the respondent supports their position, but that these cases are directly and diametrically opposed to their position and contention, and, further, that there is no case in American jurisprudence in which it is said that it is the duty of a court and judge against whom a contempt is committed to disqualify, unless such judge is disqualified ipso facto by constitutional or statutory provision.

A judge should yield to no man in loyalty to his duty. He should recognize but one master, the law, but one voice, justice. This oath, consecrating him to the sacred observance of the obligations of his high office, was no meaningless formality. In the conscientious performance of his trust he may safely adopt the language of a great English judge as his rule and guide:

"The lies of calumny carry no terror to me. I will not avoid doing what I think right, though it should draw on me the whole artillery of libels—all that falsehood and malice can invent—or the credulity of a deluded populace can swallow."

In the Circuit Court of the United States, District of Columbia, in re Levi S. Bu r. 1 Wheeler, 503 (1823), there was quoted from the Supreme Court of the United States the reiteration of the rule as to contempt as announced in the case of Anderson v. Dunn, 6 Wheat. 207, decided by the last-named court in 1921, and reported by Mr. Wheaton, as follows:

"In that case, the judge delivering the opinion of the court says: 'that the safety of the people is the supreme law,' not only comports with. but is indispensable to. the exercise of those powers in their public functionaries, without which that safety cannot be guarded. On this principle it is that courts of justice are **universally** acknowledged to be vested. by their very creation, with power to impose silence. respect. and decorum, in their presence, and submission to their lawful mandates; and (as a corollary to this proposition) to preserve themselves and their officers from the approach and insults of pollution.

"'It is true that the courts of justice of the United States are invested, by express statute provision, with power to fine and imprison for contempts; but it does not follow from this circumstance that they would not have exercised that power without the aid of the statute, or not in cases. if such should occur, to which such statute provision may not extend; on the contrary, it is a legislative assertion of this right and incidental to a grant of judicial power, and can only be considered as an instance of abundant caution, or a legislative declaration that

the power of punishing for contempt shall not extend beyond its known and acknowledged limits of fine and imprisonment.' "

Further on it is said:

"The consequences of the want of such a power must be obvious to every reflecting mind. If the laws be not executed, anarchy will be the immediate consequence, and anarchy too often ends in tyranny. If the laws be not respected, it will be difficult, if not impossible, to execute them. * * * In order to obtain that countenance and support, they must deserve respect, and that court which may, with impunity, be treated with contempt, will inevitably be contemptible even in the eyes of the good and the virtuous. Their judgments will not be executed, the law will become a dead letter, and fraud and violence will prevail. * * * "It is not the right of the courts only, but **it is the right of the people to cause their courts to be treated with respect.** It is the public interest, and not the personal pride of the judges, as suggested at the bar, which claims this power for the courts. As individuals, we claim no more respect than our individual characters deserve; but as judges of this court, **we should betray our trust**—we should become traitors to the people, if we did not claim the respect due to a judicial tribunal, and enforce that claim by all the means which the laws allow."

"The power to punish for contempts is so indispensable to the preservation of the authority of the courts of judicature, and to both branches of the Legislature, that it has been considered by general consent conceded to them, from times of the highest antiquity to this day." In re Darby, 3 Wheeler, 1 (Tenn.—1824).

In Re Fite, 76 S. E. 426, the Georgia Court of Appeals, after determining it was the duty of the court and judges thereof against which a contempt had been committed to proceed, said:

"A judge who, knowing his duty, does not dare discharge it, is unworthy of his high office, the judicial ermine should be stripped from him, and he should pass into oblivion."

There is inscribed on a tablet of imperishable marble, which is placed in the masonry within the Supreme Court room of this state, this maxim:

"The safety of the state is the highest law."

The inscription on that tablet is particularly applicable in the matter at bar, for the **highest law** means nothing if the Supreme Court, whose duty it is in this commonwealth to define that law, can with impunity be made to suffer contemptuous attacks. Must the judge who is the object of that attack be forced to go before some other tribunal to defend the court over which he presides, and thus neglect in the meantime the official duties which belong to his office? If so, no one would be afraid to offend, nor would the insulted court attempt to punish under such discouragements. Without power to repress the efforts of designing men that shall be directed against him because of unyielding temper, how will the judge be able to uphold the dignity and integrity of the court when interests of the highest magnitude are to be settled by his decisions? When it shall be observed that the most submissive pass unmolested, will not submission at least plead in recommendation of itself? Will it not set before him the perpetual conflicts which he has to maintain in vindication of opinions in which he has no individual interest, and the unceasing calumnies to which he is exposed for the protection of others, who hardly know why he is so worried? If in so many difficulties the judge is not furnished with the means of immediate defense and repression, his authority must fall, and the rights of the people with him. See In re Darby, supra.

I now direct myself to the question as to whether a court and a judge thereof against whom a contempt is committed are disqualified to dispose of the contempt.

In Dale v. State (Ind.) 150 N. E. 781 (syl. 5 and 6), it is said that a contempt is neither civil nor criminal action, but that the contempt therein considered is in the nature of a criminal action.

"It has been the general rule that contempts of the court have been dealt with by the **court and judge** against which such contempt has been directed. * * * It is the invariable rule that it is for the court which made the order in an equitable proceeding to punish for contempt of the court based upon a refusal to obey or comply with the order made by the court. * * * The law recognizes no excuse why a change of venue ought to be granted from the presiding judge in such a summary proceeding. * * * But it is well recognized as now settled that criminal contempts of the courts as well as direct contempts are to be tried summarily by the court. The interference in the long established practice of the court in trying such cases summarily would be violent should the change be made to the regular course and way of procedure as followed in the ordinary civil or criminal causes, in which the cases of contempt would be subject not only to removal from the judge by a change of venue, but to removal from the county: also subject to delay in the trial usually accorded to parties in civil actions. Were the change to be made to civil procedure to any extent, the courts would lose that power so

long recognized to preserve the dignity of the court and the good name thereof. Merchants' S. & G. Co. v. Board (1912) 201 Fed. 20, 120 C. C. A. 582; State v. Frew (1884), 24 W. Va. 412, 49 Am. Rep. 257."

6 R. C. L., p. 520, paragraph 33, is as follows:

"The power to punish for contempt, whether expressly conferred by some positive enactment or regarded as an incident to jurisdiction conferred upon the court, 'exists merely for the purpose of enabling it to compel due decorum and respect in its presence and due obedience to its judgments, order, and process. Hence, it is in no case authorized to inquire respecting or to punish contempts or any other court or tribunal. unless the latter is an agency or a part of the punishing court, and the contempt must, therefore, be regarded as a contempt of it and the power to punish as an incident for maintaining its authority. (Puterbaugh v. Smith, 131 Ill. 199, 23 N. E. 428, 19 A. S. R. 30; State v. Shepherd. 177 Mo. 205, 76 S. W. 79, 99 A. S. R. 624; In re Williamson, 26 Pa. St. 9, 67 Am. Dec. 374.) This is the rule even though the contempt constitutes also a libel on the judge. (Myers v. State, 46 Ohio St. 473, 22 N. E. 43, 15 A. S. R. 638.)"

13 C. J. 60. paragraph 83:

"Since no court except that against which a contempt is committed has power to punish it, the general rule is that a party accused of contempt is not entitled to a change of venue (Merchants' S. Co. v. Chicago Bd. of Trade, 201 Fed. 20; Bloom v. People, 23 Colo. 416, 48 Pac. 519; Crook v. People, 16 Ill. 534; State v. 2nd Jud. Dist. Ct., 30 Mont. 547, 77 Pac. 318; State v. Harney, 30 Mont. 192, 76 Pac. 10; People v. Williams. 51 App. Div. 102, 64 N. Y. S. 457; In re Brown, 168 N. C. 417, 84 S. E. 690; Noble Tp. v. Aasen, 10 N. D. 264, 86 N. W. 742), especially if the contempt was committed in the presence of the court."

13 C. J. 52, paragraph 69:

"Since contempt proceedings are substantially criminal in their nature, one court is not authorized to punish a contempt against another court or judge, unless such other court or judge is an agency or part of the court inflicting the punishment as, for instance, where the court is composed of several divisions, or as in the case of a referee, or the like. * * * (Bessette v. Conkey Co., 194 U. S. 324, 24 S. Ct. 665. 48 L. Ed. 997; Ex parte Tillinghast, 4 Pet. 108. 7 L. Ed. 798; Merchants' Stock, etc., v. Chicago Bd. of Trade, 201 Fed. 20, 120 C. C. A. 582; Kirk v. Milwaukee Dust Collector Mfg. Co., 26 Fed. 501: In re Litchfield, 13 Fed. 863: Voorhees v. Albright. 28 F. Cas. No. 16, 999; Callan v. McDaniel, 72 Ala. 96: People v. Placer County Judge, 27 Cal. 152; Ormond v. Ball, 120 Ga. 916, 48 S. E. 383; Tindall v. Wescott, 113 Ga. 1114, 39 S. E. 450, 55 L. R. A. 225;

In re Fite, 11 Ga. 665, 76 S. E. 397; People v. Grogan, 178 Ill. A. 314; Lockwood v. State, 1 Ind. 161; Kissell v. Lewis, 27 Ind. A. 302, 61 N. E. 209; Drady v. Polk County Dist. Ct., 126 Iowa, 345, 102 N. W. 115; Moore v. Jessamine, Litt. Sel. Cas. 104; Andrescoggin R. Co. v. Andrescoggin R. Co., 49 Me. 392; Fitzsimmons v. Detroit Bd. of Canvassers, 119 Mich. 147, 77 N. W. 632, Atchison, etc. R. Co. v. Jennison, 60 Mich. 232, 27 N. W. 6: State v. Ryan, 182 Mo. 349, 81 S. W. 435; Nebraska Children's Home Soc. v. State, 57 Neb. 765, 78 N. W. 267; Johnson v. Bouton, 35 Neb. 898, 53. N. W. 995; Phillips v. Welch, 12 Nev. 158; Mills v. Mills, 95 Misc. Rep. 231, 158 N. Y. S. 735; N. Y. Typothetae v. Typographical Union, 66 Misc. Rep. 484, 123 N. Y. S. 967; Id., 138 App. Div. 293, 122 N. Y. S. 975; Strong v. Strong, 28 N. Y. Super, 612; Wicker v. Dresser, 14 How. Pr. 464; In re Rhodes, 65 N. C. 518; In re Williamson, 67 Am. Dec. 374; Del Toro v. Municipal Ct., 16 Porto Rico, 89, Graham v. Williamson, 128 Tenn. 720, 164 S. W. 781; Sanders v. Metcalf, 1 Tenn. Ch. 419; State v. Thurmond. 37 Tex. 340; Alfred v. Alfred, 87 Vt. 542, 90 A. 580; Crosby's Case, 3 Wills, C. P. 188, 95 Reprint, 1005; In re Clarke, 7 U. C. Q. B. 223.)"

The sole adjudication of contempts, and the punishment thereof, in any manner, belongs exclusively, and without interference, to each respective court. Bessette v. Conkey Co., 194 U. S. 324, 24 Sup. Ct. Rep. 665, 48 L. Ed. 997.

In Lamberson v. Superior Court of Tulare County (Cal.) 91 Pac. 100, it is said:

"Nor is the judge disqualified from sitting in the contempt proceedings. Petitioner's theory in this regard. if we understand it, is that the judge is disqualified from hearing the proceedings in contempt, because the contempt itself consists in imputations upon his motives. and attack upon his integrity. Such is not and never has been the law. The position of a judge in such a case is undoubtedly a most delicate one, but his duty is none the less plain, and that duty commands that he shall proceed. However willing he may be to forego the private injury, the obligation is upon him by his oath to maintain the respect due to the court over which he presides. As was said by the Chief Justice in Re Philbrook, 105 Cal. 471, 38 Pac. 511. 45 Am. St. Rep. 59: 'The law which in such cases makes us the judges of offenses against the court places us in an extremely delicate and invidious position, but it leaves us no alternative except to allow the court and the people of the state, in whose name and by whose authority it acts. to be insulted with impunity, or to exercise the authority conferred by law for the purpose of compelling attorneys to maintain the respect due to courts of justice and judicial officers.' Were the rule otherwise so

that it was required that another judge should be called in to sit in the proceeding, the recalcitrant and offending party would need only to insult each judicial officer in turn until the list was exhausted. and thus, by making a farce of legal procedure, go scatheless and unpunished."

In Meyers v. State, 46 Ohio St. 491, 22 N. E. 43, it is said:

"Though the libel was, in large part, against the presiding judge, that fact did not disqualify him from trying the proceedings in contempt. It was not the libel against the judge which constituted the offense for which the respondent was liable as for a contempt of court. The offense consisted in the tendency of his acts to prevent a fair trial of the cause then pending in the court. It is this offense which constitutes the contempt, and for which he could be punished summarily; and the fact that in committing this offense, he also libeled the judge, and may be proceeded against by indictment therefor, is no reason why he may not and should not be punished for the offense against the administration of justice.

"The statute clearly authorizes, as did the common law, courts to punish summarily, as contempts, acts calculated to obstruct their business. They could not be maintained without such power, nor could litigants obtain a fair consideration of their causes in a court where the jury or judge should be subject during the trial, to influences in respect to the case upon trial, calculated to impair their capacity to act impartially between the parties. Nor is there serious danger to the citizen in its exercise. Power must be lodged somewhere, and that it is possible to abuse it is no argument against its proper exercise. But we think the danger more imaginary than real."

In Cock v. United States, 267 U. S. 517, 69 L. Ed. 767, cited by respondent, Chief Justice Taft of the Supreme Court of the United States said that, where personal criticism existed, or an attack upon the judge was made (there is no personal attack as to me by the respondent), such a judge must banish the slightest personal impulse to reprisal, but he should not bend backward and injure the authority of the court by too great leniency, and that where not impracticable, where delay might not injure public or private rights, and where a personal attack upon the judge existed in a contempt case, and where it was not a scheme to drive the judge out of the case for ulterior motives, then, and under such circumstances, without flinching from his duty, such a judge might properly ask that one of his fellow judges take his place. The wisdom of the great American jurist is disclosed in his careful approach of the advice

given in regulation of the inferior court, the District Court of the Northern District of Texas, and this rule, while not binding, should be highly persuasive in our regulation of inferior courts of this state, when and where there is more than one judge within the district. But this dictum was not intended to apply to the Supreme Court of the United States, and cannot by analogy be made to govern the situation pending in the Supreme Court of the state of Oklahoma. The rule of law announced in that case, to wit: "The scheme of committing acts of contempt palpably aggravated by a personal attack upon the judge, in order to drive him out of the case for ulterior reasons, should not be permitted to succeed'" should be decisive of the issue here.

On January 13th, last, under the facts as applied to me, I thought it my duty, as a Justice of the Supreme Court, not to disqualify in such a contempt case, but to proceed as long as lawful so to do.

As recited heretofore, the regularly elected Supreme Court of this state on February 2nd, in cause No. 18123, denied the writ of mandamus, and the appointed court thereafter allowed and issued the said writ. Ordinarily, it is the duty of courts to enforce their judgments and decrees, and under this theory the court in cause No. 18123 might have issued a writ of prohibition against the court in No. 18080, to prevent the latter from enforcing its writ, and in effect reversing the judgment of the former. Such action would have presented an intolerable conflict. But now, because of my respect for all constituted authority, whether I agree with that authority or not. I have, as I was commanded to do, and in order to avoid an intolerable conflict of courts, certified my disqualification.

In Commercial Union of America, Inc., v. Anglo-South American Bank. Ltd., 10 Fed. Rep. (2nd Series) 937, the rule as laid down in the second paragraph of the syllabus is as follows:

"Judges of co-ordinate jurisdiction, sitting in the same court and the same case, should not overrule the decisions of each other."

In Shreve v. Cheesman, 69 Fed. 785, 16 C. C. A. 413, Judge Sanborn, writing for the Circuit Court of Appeals in the Eighth Circuit, in 1895, said:

"It is a principle of general jurisprudence that courts of concurrent or co-ordinate jurisdiction will follow the deliberate decisions of each other, in order to prevent unseemly conflicts, and to preserve uniformity

of decision and harmony of action." Oglesby v. Attrill, 14 Fed. 214; Reynolds v. Iron Silver Mining Co., 33 Fed. 354; Wakelee v. Davis, 44 Fed. 532.

Thus is stated the rule of comity and of necessity. And it is said further:

"But the rule itself, and a careful observance of it, are essential to the prevention of unseemly conflicts, to the speedy conclusion of litigation, and to the respectable administration of the law, especially in the national courts, where many judges are qualified to sit at the trials, and are frequently called upon to act in the same cases. It is unavoidable that the opinions of several judges upon the many doubtful questions which are constantly arising should sometimes differ, and a rule of practice which would permit one judge to sustain a demurrer to a complaint, another of co-ordinate jurisdiction to overrule it and to try the case upon the theory that the pleading was sufficient, and the former to then arrest the judgment, upon the ground that his decision upon the demurrer was right, would be intolerable. It has long been almost universally observed." Taylor v. Decatur Co., 112 Fed. 449; Plattner Implement Co. v. International Harvester Co. of America, 133 Fed 376 66 C. C. A. 438.

Not only as a matter of comity between courts should this court in this cause refrain from in effect overruling the Supreme Court in cause No. 18123, involving the same persons and same subject-matter, but a fortiori the judgment in cause No. 18123, under decisions of this court too numerous to be cited, and under well-considered decisions of all courts, is res judicata as to the matter presented in cause 18080, the writ of mandamus. Such a decision, conclusive in reason of this, and in a mandamus case, is Richardson County v. Drainage District, 147 N. W. 205, in which the Nebraska court held that a judgment in mandamus was a complete bar to an action in injunction, the syllabus saying.

"A judgment in mandamus is conclusive upon the parties to an action of all issues of fact litigated therein."

A mandamus case likewise decisive is People v. Circuit Judge, 40 Mich. 63, in which the Michigan court held mandamus will not lie to compel a circuit judge to proceed to trial when a bill has been filed and injunction allowed to restrain it.

Another decision applied to extraordinary writs and judgments therein as being res adjudicata is Shumate v. Fauquier County, 5 S. E. 570, a quo warranto case, in which the Virginia court held a judgment in quo warranto was a bar to a writ of mandamus

on the same ground. The principle is well settled that a judgment is conclusive if upon the direct point, even though the objects of the two suits be different. Here the objects are the same. Freeman on Judgments (3rd. Ed.) p. 249. The parties are not strangers to the proceedings, and should not be permitted, if they would, to question the judgment in No. 18123. County Commissioners v. U. S., 112 U. S. 217, 5 Sup. Ct. 108; Harshman v. Knox Co., 122 U. S. 306, 7 Sup. Ct. 1171a. Blackstone says that a judgment or writ of quo warranto is final and conclusive even against the crown. Leroy v. House, 1 Sid. 86; 2 Bl. Comm. 263; Ames, v. Kan., 111 U. S. 449.

Likewise the judgment in cause No. 18123 should be considered as estoppel in judgment against the consideration of the same subject-matter between the same parties in cause No. 18080.

So now we have three additional reasons presented, each of them conclusive within itself, as to why the opinion of the majority is in error. These are: (1) Comity between courts; (2) the matter is res adjudicata; (3) estoppel in judgment.

It, therefore, follows that the appointed Supreme Court, in cause No. 18080, was bound by the decision of the regularly elected Supreme Court in cause No. 18123, and under the rule announced in Commercial Union of America v. Anglo-South American Bank, supra, this court of co-ordinate jurisdiction should not overrule the decision of that court of equal rank and jurisdiction in a matter involving the same subject-matter and between the same parties.

In Back et al. v. State (Neb.) 106 N. W. 787, being the only contempt case cited by the majority opinion as bearing out their contention that a Judge of the Supreme Court may be recused in a contempt case for alleged bias and prejudice, it is true that in that case, decided February 8, 1906, Chief Justice Sedgwick, speaking for the court, said:

"Upon prosecution for contempt in the district court, the judge before whom the cause is regularly to be heard may refuse to transfer the cause to another judge of the same court for hearing, unless it is made to appear by due proof that a fair and impartial trial cannot be had before him, or that some other ground for change of venue prescribed by statute exists."

In that case the affidavit did not contain such allegations and the proof did not show that the contemnor could not secure a fair and impartial trial.

In the case at bar, while it is true the allegations state that Mr. Justice Clark and myself are biased and prejudiced, the respondent was by the court invited to offer proof and he wholly failed to avail himself of this opportunity. Having failed to prove allegations of bias and prejudice contained in his application for a writ, he can only stand upon the admitted existence of suits which have started after judgment was rendered in the Riverside Case. But be that as it may, the case cited, Back et al. v. State, supra, is not a proper foundation for the majority opinion, for the reason that this case was overruled the following year, on December 18, 1907, by the same court, speaking through the same judge, when he said in Connell v. State (Neb.) 114 N. W. 294, syl. 2:

"When the acts complained of are done in the presence of the court, the defendant is not entitled to a change of venue on account of alleged prejudice of the court, nor is he entitled to trial by jury. * * *"

And in the latter case it is said:

"It was the duty of the court to hear the matter himself, and the defendants' application for a change of venue was rightly overruled. These two propositions are elementary. * * *"

In State v. Newton, 62 Ind. 517, wherein a contempt was committed by failure to obey a subpoena issued by a justice of the peace, and wherein under their statutes a change of venue is provided for in justice courts when a party files an affidavit that he believes he cannot secure an impartial trial before such justice of the peace on account of bias and prejudice, it was held that the contemnor was not entitled to a change of venue and that the statute did not warrant nor authorize a change of venue from such justice of the peace in such proceedings.

In Crook v. People, 16 Ill. 534, it was held that informations for contempts were not within the meaning of their statutes in relation to change of venue.

In Jones v. Judge, 41 La. 319, 6 South. 22, it was held:

"A judge has no right to recuse himself where a party to the cause could not legally do so."

As I understand it, it is the judgment of the majority that Mr. Justice Clark and myself should be disqualified for unproven bias and prejudice extraneous of the matter before us. It is not proof, but it is within the knowledge of each of us, that we never knew nor dealt with the respondent before his entrance into these extraneous, vexatious acts of Mr. Owens, the respondent's client. Likewise, that these harassing acts did not occur until after the respondent and his client had selected and accepted the forum of which we are elected members and until an adverse judgment was rendered against him.

We can and should, by the decisions of this court as cited in Burke v. Territory, 2 Okla. 499, 37 Pac. 829, take judicial notice of every stage of the proceedings as applied to the Riverside Case. We judicially know that the respondent Martin, as attorney for Mr. Owens in cause No. 36361, pending before the Honorable R. D. Hudson, district judge of Tulsa county, by extraordinary process restrained us as Justices of the Supreme Court (until he was prohibited solely in such restraint) from proceeding further in the considering of the Riverside Case, an action without counterpart in any jurisprudence—and that then he, Martin, appeared in open court before the Supreme Court and contended that since we were sued, we should disqualify. A most preposterous contention. To be plain. he contended, in effect, that when a satisfactory judgment is not rendered a disgruntled suitor might sue the judges for deciding against him, allege fraud and corruption, make the judge a party to an ancillary action and thus disqualify the judge, thus change the forum, and so on and on until a satisfactory judgment was secured or until the list was exhausted from which judges might be drawn, or until patience ceased to be a virtue and the majesty of the law yielded to vexation. Such contention could have but one purpose and that was, as expressed by Chief Justice Taft in the Cook Case, supra, "a scheme to drive the judge (judges) out of the case."

The majority opinion says that in the event Mr. Justice Clark and myself were to sit we would be called upon to decide an issue which might vitally affect the result of litigation in Tulsa county and Oklahoma county now pending between us and the respondent. Not so. The libel case in Oklahoma county grows out of an advertisement with which Mr. Martin is not shown to have any concern either in the preparation, printing, or publication. That publication forms no part of this contempt action. Mr. Martin and Mr. Owens are separately charged in separate actions filed and numbered in this court.

The action in Tulsa county, as heretofore stated, is one of which Mr. Owens sues us,

alleging that we, together with two former Chief Justices of this court, and together with 123 other persons, ente.ed into a conspiracy to defraud him, and did defraud him by the judgment rendered in the Riverside Oil Case.

It is the well-settled law that judicial officers are not liable in civil actions for their judicial acts within the scope of their jurisdiction.

In Waugh v. Dibbens et al., 61 Okla. 221, 160 Pac. 589, it said:

"An action will not lie against a judicial officer for a judicial act, where there is jurisdiction of the person and the subject-matter, although it be alleged and proved that such act was done malicious'y, or even corruptly."

This rule of law is firmly announced in the following decisions: Comstock v. Eagleton, 11 Okla. 487, 69 Pac. 955; Flint v. Lonsdale, 41 Okla. 448, 139 Pac. 268; Broom v. Douglass (Ala.) 57 South. 860; Shaw v. Mcon (Ore.) 245 Pac. 318.

In Roberston v. Hale (N. H.) 44 Atl, 695, it is said:

"It is a general rule that courts and judges are not liab'e in civil actions for their judicial acts within the scope of their jurisdiction, and this protection extends to magistrates exercising an inferior and limited jurisdiction,—as justices of the peace. For the purpose of securing a fearless and impartial administration of justice, and to guard against an opp:essive abuse of l'egal authority, the law exempts all judicial officers, from the highest to the lowest, from civil liability in the performance of their judicial duties within their jurisdiction, but makes them liable to impeachment or indictment for official misconduct or corruption. Evans v. Foster, 1 N. H. 374; Burnham v. Stevens. 33 N. H. 247: State v. Towle, 42 N. H. 540: Jordan v. Hanson, 49 N. H. 199; Waldron v. Berry. 51 N. H. 136; State v. Ingerson, 62 N. H. 437; Boody v. Watson, 64 N. H. 162. 9 Atl. 794. In cases upon this subject courts do not undertake to revise the doings of the tribunal whose acts are brought in question collaterally, but only to examine them so far as to ascertain whether the tribunal was acting within its jurisdiction. They proceed upon the ground that, if the tribunal had jurisdiction, its judgment is conclusive, and cannot be examined or reversed collaterally, but must stand until reversed by some proceeding instituted for that purpose."

In Bradley v. Fisher, 13 Wall. 335, 20 L. Ed. 646, the reason for the rule is announced as follows:

"If civil actions could be maintained in such cases against the judge, because the losing party should see fit to allege in his complaint that the acts of the judge were done with partiality, or maliciously or corruptly, the protection essential to judicial independence would be entirely swept away. Few persons sufficiently irritated to institute an action against a judge for his judicial acts wou'd hesitate to ascribe any character to the acts which would be essential to the maintenance of the action."

In Yaselli v. Goff 'et al., 12 Fed. (2nd) 396, it is said:

"There are weighty reasons why judicial officers should be shielded in the proper discharge of their official duties from harassing litigation at the suit of those who think themselves wronged by their decisions and that injustice has been done. A defeated party to a li'igation may not only think himself wronged, but may attribute wrong motives to the judge whom he holds responsible for his defeat. He may think that the judge has allowed passion or prejudice to control his decision. To allow a judge to be sued in a civil action on a complaint charging the judge's acts were the result of partiality or malice, or corruption, would deprive the judges of the protection which is regarded as essential to judicial independence. It is not in the public interests that such a suit should be maintained, and it is a fundamental principle of English and American jurisdiction that such an action cannot be maintained."

There are no cases to the contrary, so that I now say, since Owens accepted this forum, admitted jurisdiction in the Riverside Case, subsequently failed to obtain a favorable judgment, and thereafter in the Tulsa county district court sued 123 persons, joining Justice Clark and myself, alleging fraud in the judgment, that we are not liable, and hence cannot be called upon in this contempt case to decide any matter vital to either the litigation in Tulsa county or Oklahoma county.

Article 2, section 6, of the Constitution of Oklahoma, being relied upon by the majority opinion, is set out as follows:

"Right and justice shall be administered without sale, denial, delay, or prejudice."

I take it that the majority base their action and theory solely upon the word "prejudice" in said constitutional provision contained.

I have endeavored thus far to set out the prevailing and universal doctrine of law that in contempt cases a judge cannot and should not be recused for prejudice alleged or proven. This rule is different in civil and criminal matters. The word "preju-

dice" cannot be said to apply in contempts committed after a litigant has accepted the forum. If so, when a litigant observed that an unfavorable decision to him was about to be rendered, he need but to strike the court, then allege that by reason of the blow the court and judge thereof was biased and prejudiced against him, and therefore the judge must stand aside—and continue such acts ad infinitum. Such should not be the law.

This section of our Constitution is based largely upon Magna Carta, chapter 40, which provides:

"We will sell to no man, we will not deny to any man, either justice or right."

Maryland's Constitution provides that every man ought to have remedy "speedily without delay according to the law of the land." Idaho's Constitution, art. 1, sec. 18, is substantially the same as ours. In the constitutional provisions of practically all of the states denial and delay of justice is prohibited. Arkansas (1874) 2-13; Colorado (1876) 2-6; Connecticut (1818) 1-12; Delaware (1897) 1-9; Florida (1885) Declaration of Rights 4; Illinois (1870) 2-19; Indiana (1851) 1-12; Kentucky (1890) 14; Massachusetts (1780) 1-11; Maryland (1867) Declaration of Rights 19; Maine (1819) 1-19; Minnesota (1857) 1-8; North Carolina (1876) 1-35; North Dakota (1889) 22; New Hampshire (1902) 1-14; Oregon (1857) 1-10; Pennsylvania (1873) 1-11; Rhode Island (1842) 1-5; South Carolina (1895) 1-15; Tennessee (1870) 1-17. Vermont (1793) 1-4; West Virginia (1872) 3-17; Wisconsin (1848) 1-9; Alabama (1901) 1-13; Mississippi (1890) 24; Montana (1889) 3-6; Wyoming (1889) 1-8.

There is contained in the cited constitutional provision of our state this mandate: "Justice shall be administered without * * * denial, delay. * * *"

Should we sit idly by and permit the lawful orders and mandates of this court to be delayed by a contempt, if one has been committed? We think not. Moreover, to do so would be, in our judgment, a denial of justice and a violation of the provisions of said constitutional provision. When a litigant wins he is entitled relief, and relief immediately—"Justice delayed is justice denied." To permit justice to be denied by a vacillating act of the court is to allow the Constitution, its provisions, and rights of the people to go down to the same grave with the courts. How are fundamental and constitutional guarantees to be upheld without

there be a court with courage to stand as a bulwark for constitutional liberties?

We are resolved that acts of a disgruntled litigant and a vexatious and ill-informed counsellor shall not drive us from the path of duty, and we shall not prostitute ourselves by voluntarily accepting the easier way. We observe the historic words of Madame Roland when she said: "O Liberty! what crimes are committed in thy name!" And we are determined, in so far as our acts shall be effective, that the respondent cannot convert his own misdeeds into a shield against his own wrongs; that he should not be permitted to profit by his own perversity. **Nullus commodum capere potest de injuria sua propria.**

It is said in the majority opinion, "No one should be a judge in his own cause." We question the applicability of the maxim.

The position held by Justice Clark and myself is now held by the writers of the majority opinion. The oath taken by us was administered to them. The duty we owed the state to uphold its highest court now rests upon them, by their oath. If it can be said that, as members of this court, we were disqualified because it was our cause, then it may be said with equal reason that those men who took our places assumed our duty and burdened our cause. It is theirs. If we were disqualified by reason of our interest in seeking to preserve the court over which we presided, then the same duty, the same interest, the same disqualifications are theirs. But Broom's Legal Maxims, p. 96, says:

"That the decision of a judge made in a cause in which he has an interest is, in case of necessity, unimpeachable: * * * (e) or where a judge commits for contempt of court."

And on p. 99:

"And if a particular relation be created by statute between A. and B. and a duty be imposed upon A. to investigate and decide upon charges preferred against B., the maxim 'nemo sibi esse judex vel suis jus dicere debet' would not apply." The Queen v. Bishop, 92 Q. B. D. 454.

For the reasons herein recited. I most respectfully dissent from the opinion of the majority and most seriously question the wisdom of the rule they have announced.

I am authorized to say that Justice Clark, who assisted in the preparation of this opinion. concurs.

Note.—See under (1) 12 C. J. p. 1287,

§1100; p. 1289, §1103; 33 C. J. p. 999, §150; p. 1018, §191; 15 R. C. L. p. 530; 3 R. C. L. Supp. p. 467; 4 R. C. L. Supp. p. 1000; 6 R. C. L. Supp. p. 921. (2) 33 C. J. p. 1018, §191. (3,4) 33 C. J. p. 990, §132.